UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-8234-Civ-Dimitrouleas/Johnson

FRANK H. SIMPSON, ANGELINA L. SIMPSON,
CAROL A. SULLIVAN, and NGOC HOA HUA,
On Behalf of Themselves and All Others
Similarly Situated,

        Plaintiffs,

                            Case No. 00-8234
v.                           Jury Trial Demanded

NEW ENGLAND INTERNATIONAL        Complaint - Class Action
SURETY, INC.,

        Defendant.
_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

      Plaintiffs Frank H. Simpson ("F. Simpson"), Angelina L. Simpson ("A. Simpson"),

Carol A. Sullivan ("Sullivan"), and Ngoc Hoa Hua ("Hua"), on behalf of themselves and all

others similarly situated, bring this action against Defendant New England International

Surety, Inc. ("New England"), and allege as follows:

### I. JURISDICTION AND VENUE

      1.    This Court has jurisdiction over this action pursuant to sections 1331, 1332 and

1367 of title 28 of the United States Code.  The claims of Plaintiffs are premised on the

Securities Act of 1933 (the "Securities Act") 15 U.S.C. § 77a et seq., the Securities Exchange

Act of 1934 (the "Exchange Act") 15 U.S.C. § 78a et seq., and 17 C.F.R. § 240.10b-5, and

common law claims.



2.  Venue is proper in the Southern District of Florida because some of the Plaintiffs reside in the Southern District of Florida, and Defendant has conducted business in the Southern District of Florida.

3.  New England is subject to the *in personam* jurisdiction of this Court by virtue of the following:

>   (a)  operating, conducting, engaging in, and carrying on business in the United States, including the state of Florida;

>   (b)  engaging in acts specifically designed and intended to induce residents of the United States, including residents of the state of Florida, to invest in promissory notes of the type used and described with greater specificity below;

>   (c)  breaching contracts formed in the United States, including contracts formed in the state of Florida; and

>   (d)  committing acts in and causing injury to Plaintiffs and Class Members in the United States, including Plaintiffs and Class Members in the state of Florida, while engaged in the conduct of the scheme alleged below.

4.  In connection with the activity alleged herein, Defendant directly and indirectly used means and instrumentalities of interstate and foreign commerce, including the United States mail, the Internet and interstate and foreign wire communications.

2

## II. THE PARTIES

5.　　Plaintiffs F. Simpson and A. Simpson are residents of the state of Florida. Plaintiffs Hua and Sullivan are residents of the State of California.

6.　　Defendant New England is a foreign corporation which was incorporated under the laws of Panama. New England maintains its principal place of business in Brussels, Belgium.

## III. FACTS COMMON TO ALL COUNTS

### A.　The Sales to the Plaintiffs

7.　　At all times herein material, New England was engaged in the business of assisting companies in raising capital through the issuance of promissory notes to the general public, including Plaintiffs and Class members. This assistance included issuance of guarantees to Plaintiffs and Class Members.

8.　　Plaintiff F. Simpson was induced to invest $25,000 in a promissory note issued by Pacific Air Transport Inc. ("Pacific Air") on or about December 7, 1998. The promissory note was delivered to Plaintiff at a later date.

9.　　Plaintiff A. Simpson was induced to invest $25,000 in a promissory note issued by Pacific Air on or about December 7, 1998. The promissory note was delivered to Plaintiff at a later date.

10.　　Plaintiff Hua was induced to invest $63,097.57 in a promissory note issued by Pacific Air on or about March 25, 1999. The promissory note was delivered to Plaintiff at a later date.

3

11.     Plaintiff Sullivan was induced to invest $25,000 in a promissory note issued by Digizap Technologies LLC ("Digizap") on or about May 19, 1999.  The promissory note was delivered to Plaintiff at a later date.

12.     To induce Plaintiffs and Class Members to make investments in promissory notes issued by Pacific Air, Digizap, Canko Environmental Technologies, Inc. ("Canko"), RMW/Corlogic, Inc. ("Corologic"), Caffe Diva Group Ltd. ("Caffe Diva"), Technical Support Services, Tri-National Development Corp. ("Tri-National"), South Mountain Resort & Spa, Inc., Sun Broadcasting Systems, Inc., Alumalex, Sebastian International Enterprises, Inc. ("Sebastian"), World Vision Entertainment, Inc. ("World Vision"), Ameritech Petroleum, Inc., and Lomas DeLaBarra Development, Inc./Uruguay, and other companies (all such companies are hereinafter referred to collectively as "Investment Companies"), New England guaranteed the repayment of the loans, which guarantees were memorialized in written agreements of the kind and type attached hereto as Exhibits "A," "B," and "C."

13.     New England issued guarantees to Plaintiffs A. Simpson and F. Simpson on or about December 22, 1998. (See attached Exhibit "A")  These guarantees were delivered to Plaintiffs at a later date.

14.     New England issued a guarantee to Plaintiff Hua on or about April 13, 1999. (See attached Exhibit "B")  This guarantee was delivered to Plaintiff at a later date.

15.     New England issued a guarantee to Plaintiff Sullivan on or about May 27, 1999. (See attached Exhibit "C")  This guarantee was delivered to Plaintiff at a later date.

4

16. Although Pacific Air, Digizap, and the other Investment Companies defaulted

on the promissory notes issued to Plaintiffs and Class Members, New England has failed to

honor its obligations under the terms of its guarantee agreements with Plaintiffs and Class

Members.

**B.    Overview of the Scam**

17. Promissory note fraud of the sort alleged in this action is now the most

prominent form of securities fraud in the country. According to USA Today:

> With startling speed and little warning, promissory note fraud has
> become the No. 1 type of securities fraud in many states across the country. The
> scams have taken at least $300 million from thousands of elderly Americans,
> regulators estimate.

Noelle Knox, Scam Targets Retirees' Savings, USA Today, 2000 W.L. 5779703, May 31, 2000.

at 1B.

18. The Securities and Exchange Commission ("SEC") and many state regulatory

authorities have become concerned about this new form of fraud. Consequently, in June 2000,

they

> announced a joint effort to combat the fraudulent sale of promissory notes,
> which they say has caused investors, many of them elderly, to lose hundreds of
> millions of dollars nationwide. As part of the crackdown, the Securities and
> Exchange Commission filed 13 enforcement actions naming 38 individuals and
> 22 entities it claims are involved in selling bogus promissory notes. Regulators
> in 28 states, including California, Florida, and New York, joined in the
> enforcement "sweep," issuing cease-and-desist orders and filing civil and
> criminal lawsuits against sellers. Promissory notes are a type of investment in
> which investors lend money to a company in exchange for a fixed amount of
> income. Fraudulent promissory notes typically promise returns of 9% to 18%
> and a very low level of risk. "Investors are attracted to this type of investment
> because it has an aura of safety with an above-market rate of return," said

5

Bradley Skolnik, Indiana's Securities Commissioner and President of the North American Securities Administrators Association.

Judith Burns, <u>SEC, States Pursuing Legal Action Against Alleged Promissory-Note Fraud</u>,

Dow Jones Business News, June 1, 2000.

19.     Defendant New England played an integral role in many of these scams by

purporting to guarantee these notes.

Under the guise of a marketing company, the con artists seek out struggling start-up companies that need money. The marketing firms, which charge the start-up a hefty commission of about 20%, then recruit independent insurance agents around the country to sell the bogus notes. **The notes typically come with a worthless repayment guarantee from a fake foreign insurance company. . . .**

**The marketing company finds or creates an insurance company -- often an off-shore or shell company -- to guarantee the notes.** The insurance company recruits insurance agents to sell the notes, offering a nice commission. Agents sell the notes to the public as risk-free investments.

Knox, <u>Scam Targets Retirees' Savings</u>, at 1B, 1A (emphasis added).

A typical note scam works like this: A start-up company with little or no sales raises money by selling promissory notes through primary brokers who recruit a network of insurance agents and investment advisors. The notes usually pay 10 percent to 15 percent interest and are short-term; nine months is a common maturity. **They also are backed by a financial guarantee "bond" from an insurance company, which turns out to be insolvent or non-existent.** The money is used to pay sales commissions and make interest payments -- and often to finance a lavish lifestyle for company principals. Ultimately, the company files for bankruptcy and the investors are out of luck. Florida has been a hot bed of high-yield note activity.

Helen Huntley, <u>Investors Warned of High-Yield Note Ploy</u>, St. Petersburg Times, 2000 WL

5616960, June 2, 2000 at 1E (emphasis added).

20.     The SEC and the state regulatory authorities have repeatedly found that notes guaranteed by New England were illegally not registered with the state and federal regulatory authorities and sold through numerous misrepresentations and failures to disclose.  For example, the SEC filed an action against Pacific Air, which issued the notes purchased by Plaintiffs A. Simpson, F. Simpson, and Hua, and found that New England's guarantees did not exist.

> In addition to promising returns in excess of similar fixed investments, **Pacific Air represented that investor funds were guaranteed by an off-shore insurance company.  Notwithstanding these representations, the guarantee did not exist** and the majority of the Pacific Air noteholders, many of whom are elderly, have lost most, if not all, of their investment.

SEC v. Pacific Air Transport, Inc., SEC Litig. Release No. 16569, 2000 WL 708425 (May 31, 2000) (emphasis added).

21.     In SEC v. Capital Acquisitions, SEC Litig. Release No. 15601, 1997 WL 786796 (Dec. 23, 1997), the SEC found that Capital Acquisitions, Inc., a fraudulent Ponzi scheme, had failed to disclose "that New England International Surety, Inc., a Panamanian company which is the purported guarantor on the notes, is to receive 20% of the amount raised."  The SEC filed an action in the Middle District of Florida, alleging that sales agents in connection with Sebastian promissory notes made misrepresentations regarding "the alleged existence of a surety bond guaranteeing the notes." SEC v. Ballou, SEC Litig. Release No. 16572, 2000 WL 708428 (May 31, 2000).  The SEC sued World Vision, another unregistered promissory note Ponzi scheme, because the sales agents "misrepresented that the notes were unconditionally guaranteed and insured."  SEC v. Piromalli, SEC Litig. Release No. 16577, 2000 WL 708432

(June 1, 2000). For two more promissory note schemes, Ameritech Petroleum and RedBank Petroleum, Inc., the SEC charged that sales agents had misrepresented these promissory notes "as risk-free investments with above market rates of return, and backed by an unconditional guarantee by an independent insurance company. In fact no such guarantee existed." SEC v. Wagman, SEC Litig. Release No. 16558, 2000 WL 633255 (May 17, 2000).

22.      The State of Wisconsin barred New England from selling promissory notes in that state, because the notes were unregistered securities. New England Int'l Surety, Inc., 1999 WL 1101285 (Wis. Comm'r Sec. Dec. 1, 1999). Wisconsin found that New England had entered into agreements with Corlogic, Pacific Air, Caffe Diva, Technical Support Services, Tri-National, and Sebastian "ostensibly to provide a guarantee of repayment for notes issued by" these entities. In each instance, the agreement with the issuer "specifically acknowledges that the purpose of the guarantee is 'to enhance the marketability of . . . [the issuer's] Promissory Notes." Id. The State of Connecticut likewise ordered New England to cease and desist its sales of guarantees for Sebastian promissory notes, because these guarantees were unregistered securities. New England Int'l Surety, Inc., 2000 WL 769368 (Conn. Dep't Banking Jan. 21, 2000).

23.      In 1996, the State of Washington revoked a salesperson's license, because he had sold promissory notes through misrepresentations that these notes "were guaranteed by New England International Surety, Inc., a Panamanian corporation which supposedly had its principal office in Switzerland." Irvin Nels Strom, 1996 WL 408641 (Wash. Sec. Div. July 15, 1996). In 1997, Washington found that Capital Acquisitions, Inc., promissory notes, which

8

"were ostensibly guaranteed by a bond issued by New England International Surety, Inc.,"
were sold through misrepresentations regarding "the value of the guarantee bond." Capital
Acquisitions, Inc., 1997 WL 671400 (Wash. Sec. Div. Oct. 20, 1997). The state regulatory
authorities have brought dozens of other actions involving promissory notes supposedly
guaranteed by New England, finding that the promissory note offerings were fraudulent
scams.[1]

### C.    New England's Regulatory History and Lack of Licensing.

24.    In addition to violating state securities laws, New England has a lengthy history
of violating state insurance laws, and it is not licensed as an insurer in those states. In 1989,
for example, the State of Florida directed New England not to engage in the business of

---

[1]    See, e.g., James Chmielowicz, 2000 WL 969348 (Ohio Dep't Comm. June 1, 2000)
(World Vision -- The sales agent "did not tell [the investor] that [New England] was not
licensed to do business in Ohio" and that it "was located in Switzerland."); Tucson Estate
Financial Advisors, Inc., 2000 WL 1067944 (Ariz. Corp. Comm. July 25, 2000) (Caffe Diva,
Corlogic, Pacific Air, RedBank, Sebastian, Technical Support Services, and World Vision --
"The notes were allegedly guaranteed by an insurance company bond . . . [from] New England
International Surety, Inc."); Robert Lee Scott, 2000 WL 676211 (Ohio Dep't Comm. March
28, 2000) (Canko -- The sales agent "represented to the investor that the promissory notes
issued by . . . Canko were bonded and guaranteed by . . . New England International Surety,
Inc. . . . New England . . . [was not] licensed to act as an insurer in any capacity in the State of
Ohio."); Sebastian Int'l Enterprises, Inc., 1997 WL 566180 (Pa. Sec. Comm'n Aug. 20, 1997)
(Sebastian -- "[T]he Notes are purportedly 'guaranteed' by an independent insurance
company."). See also World Vision Entertainment, Inc., 2000 WL 969346 (Ohio Dep't Comm.
May 31, 2000); Caffe Diva Group, Ltd., 2000 WL 815445 (Pa. Sec. Comm'n April 25, 2000);
Sebastian Int'l Entertainment, Inc., 2000 WL 56732 (Conn. Dep't Banking Jan. 3, 2000); World
Vision Entertainment, Inc., 2000 WL 56733 (Conn. Dep't Banking Jan. 3, 2000); Caffe Diva
Group, Ltd., 1999 WL 732233 (Wis. Comm'r Sec. Sept. 16, 1999); Sebastian Int'l Enterprises,
Inc., 1999 WL 380195 (Ala. Sec. Comm'n May 26, 1999); World Vision Entertainment, Inc.,
1997 WL 697914 (Pa. Sec. Comm'n Oct. 22, 1997); Sun Broadcasting Systems, Inc., 1997 WL
783915 (Wis. Comm'r Sec. Sept. 23, 1999); Tri-National Development Corp., 2000 WL 1270285
(Wis. Comm'r Sec. Aug. 30, 2000).

insurance in Florida until it had met the requirements of the Florida Insurance Code. Despite

this order, New England has continued repeatedly to insure promissory notes of citizens in

Florida.

25.     The State of Louisiana liquidated a New England subsidiary in 1989, and New

England's President, Henrik  Rienstra, was found in contempt of court and sentenced to one

year in jail.  According to the State of Washington:

> In 1989, New England's subsidiary, New England International Surety of
> America, was served with a cease and desist order by the Louisiana Insurance
> Commissioner's office for failing to maintain adequate capital reserves and was
> placed in liquidation.  The company's president, Henrik Rienstra, failed to
> appear at a scheduled court hearing and was found in contempt of court and
> sentenced to one year in jail if he ever returned to the United States.  New
> England International Surety, Inc. is not now and never has been licensed to do
> business as an insurance company in the State of Washington.

Capital Acquisitions, Inc., 1997 WL 671400 (Wash. Sec. Div. Oct. 20, 1997).

26.     New England pulled a "snow job" on the State of Louisiana by misleadingly

shifting funds from various bank accounts to create the illusion that it had contributed

additional funds to its subsidiary.

> In Louisiana, New England International Surety of America, Inc., pulled
> off another snow job.  It transferred nearly $1 million from a bank account in
> Louisiana to its parent company's account in Geneva, Switzerland, which in turn
> wired the money back to the United States.  Officers of the insurance company
> presented the insurance department with "proof" that the parent company had
> contributed additional money to the financially troubled insurance company.
> The true source of the financial infusion was not discovered until after the
> company went into conservation six months later.
>
> . . . .
>
> In the New England case, company funds were wired as transferred into
> and out of bank accounts among several names in New Orleans, Atlanta, Miami,

10

> Toronto, Geneva, Paris and Brussels.   The [Louisiana] Department of Insurance . . . attempt[ed] to track down the millions of dollars that . . . vanished . . . . [T]racing the funds "is akin to chasing money which has fallen into a black hole."

E. Pratt, Insurance Firm Fraud Said Hard to Detect, Baton Rouge State Times, March 12, 1990, at 1A.

27.     On November 16, 1999, the State of Kansas ordered New England to cease and desist the business of insurance in Kansas, because New England had guaranteed Technical Support Services promissory notes and failed to pay when these notes defaulted.  Kansas found that New England had represented to the public that it was authorized to act as an insurer in Kansas, but this representation was "not and ha[d] never been a true statement."

28.     The SEC found that New England was "surrounded by numerous badges of fraud," when New England attempted to intervene in the SEC's action against Sebastian in the Middle District of Florida.  According to the SEC:

> [New England] has provided virtually no information to this Court that gives any comfort regarding its bona fides or its ability to honestly and competently administer the defrauded investors' property for their benefit.  To the contrary, the available evidence indicates that [New England] has a significant regulatory history, and lacks both the capacity and inclination to serve the interests of investors.  In fact **[New England's] history -- which is replete with numerous badges of fraud -- indicates that [New England's] niche is providing illusory insurance for investment scams.**

(See attached Exhibit "D" at 4) (emphasis added).

### CLASS ACTION ALLEGATIONS

29.     The conduct by New England was systematic and continuous and has affected many individuals who invested in the promissory notes issued by the Investment Companies.

This action is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek certification on behalf of Plaintiffs individually, and as a class action on behalf of all persons or entities (the "Class" or "Class Members") who invested in promissory notes issued by the Investment Companies, including other companies which may subsequently be discovered, and insured and guaranteed by New England between January 1, 1997 through the present ("Class Period"). The class, however, does not include any selling agent or any other person or entity who received compensation for the marketing or sale of these promissory notes.

30. Membership in the Class is so numerous as to make it impractical to bring all Class Members before the Court. The exact number of Class Members is unknown, but can be determined from the records maintained by Defendant. Plaintiffs believe there are thousands of persons in the Class.

31. The named Plaintiffs are members of the class of victims described herein. They were contacted by Defendant through its agents; they were subjected to a deceptive, misleading and or fraudulent investment scheme sales presentation; and they were induced to invest in promissory notes issued by Pacific Air and Digizap, based upon the guarantees issued by New England.

32. There are numerous and substantial questions of law and fact common to all of the Class Members which will control this litigation and which will predominate over any individual issues. Included within the common questions of law and fact are:

12

(a) Whether Defendant routinely engaged in intentional or reckless fraudulent acts to induce Plaintiffs and Class Members to sign promissory notes;

(b) Whether Defendant routinely failed to disclose to Plaintiffs and Class Members material information regarding their investments and regarding New England's regulatory history and lack of licensing;

(c) Whether Defendant through its agents developed, encouraged, and engaged in a scheme to induce investments through intentional or reckless fraudulent concealment of material facts;

(d) Whether Defendant failed to honor its written guarantees to Plaintiffs and Class Members for their investment in promissory notes;

(e) Whether Plaintiffs and Class Members have sustained damages and the proper formula to measure damages; and

(f) Whether Plaintiffs and Class Members are entitled to an award of punitive damages against Defendant.

33. The claims of Plaintiffs are typical of the claims of the Class and Plaintiffs have

no interests adverse to the interests of Class Members.

34. Plaintiffs will fairly and adequately protect the interests of the Class and have

retained counsel experienced and competent in the prosecution of class actions and complex

litigation.

35. A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Absent a class action, the Class Members will continue to

suffer damage and New England's violations of law will proceed without remedy while

Defendant continues to retain its ill-gotten gains.

36. Most individual Class Members have no ability to prosecute an individual action,

due to the complexity of the issues involved in this litigation, the enormity of Defendant's

13

uniform sales scheme, and the extraordinary costs associated with this complex litigation compared to the relatively small, although significant, damages suffered by each member of the Class.

37.     This action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured.

38.     This action should present no difficulty which would impede its management by the court as a class action and is the best available means by which Plaintiffs and the Class Members can seek redress for the harm caused to them by Defendant.

## PLAINTIFFS' CAUSES OF ACTION AGAINST NEW ENGLAND

## COUNT I

## BREACH OF CONTRACT

39.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

40.     Plaintiffs and Class Members invested in promissory notes issued by the Investment Companies. Pursuant to the terms of these agreements, the Investment Companies agreed to pay to Plaintiffs and Class Members their principal investment plus interest.

41.     To induce Plaintiffs and Class Members to invest in the promissory notes, New England guaranteed the repayment of the promissory notes. New England materially breached its obligations under its agreements with Plaintiffs and Class Members by failing to pay to Plaintiffs and Class Members the principal plus interest due to be paid to Plaintiffs and Class

14

Members by the Investment Companies, after the Investment Companies defaulted or otherwise failed to honor their obligations.

42.    All conditions precedent to the maintenance of this action have occurred or have been performed, or their performance would be futile so as to satisfy all conditions precedent to the maintenance of this suit.

WHEREFORE, Plaintiffs demand judgment for damages, interest, costs of court, and such other and further relief to which they may show themselves justly entitled under the circumstances.

**COUNT II**

**SALE OF UNREGISTERED SECURITIES**

43.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if fully set forth herein.

44.    Plaintiffs and Class Members invested in various promissory notes issued by the Investment Companies. These promissory notes were securities as defined in Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

45.    To induce Plaintiffs and Class Members to invest in the promissory notes, New England issued guarantees for the promissory notes. These guarantees were securities as defined in Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78(c)(a)(10).

15

46.     No registration statements were filed with the Securities and Exchange Commission or were in effect with respect to the promissory notes and the guarantees.

47.     New England offered or sold the guarantees to Plaintiffs and Class Members.

48.     The purposes of the guarantees were to enhance the marketability of the promissory notes and to induce Plaintiffs and Class Members to invest in the promissory notes. New England knew or was reckless in not knowing that the guarantees would be used as a means to induce Plaintiffs and Class Members to purchase these promissory notes.  By agreeing to issue the guarantees, New England induced Plaintiffs and Class Members to purchase the promissory notes, and New England thereby offered or sold the promissory notes to Plaintiffs and Class Members.

49.     Through correspondence with Plaintiffs and Class Members, New England has advised Plaintiffs and Class Members that it will pay its obligations on the guarantees only if given the time to do so.  According to New England, filing lawsuits or increasing regulatory pressures would divert New England's attention and resources from its efforts to satisfy noteholder claims.  New England informed Plaintiffs and Class Members not to file lawsuits, because New England would then walk away from its obligations.  Because New England threatened not to honor its guarantees if Plaintiffs and Class Members filed lawsuits, New England is equitably estopped from asserting that the present lawsuit is time-barred.

50.     Plaintiffs and Class Members have only recently discovered that the guarantees and the promissory notes were not registered. In the exercise of reasonable diligence, Plaintiffs and Class Members had no reason to suspect that New England and the investment companies

16

had not complied with the registration requirements. The agreements between New England and the Investment Companies which were provided to Plaintiffs and Class Members expressly provided that the transactions would fully comply with all applicable laws, rules, and regulations, including but not limited to all securities laws of the United States and of any jurisdiction in which the promissory notes were marketed and sold. By entering into these agreements and transmitting them to Plaintiffs and Class Members, New England affirmatively and fraudulently concealed the necessity for registration of the guarantees and the promissory notes.

51.     New England, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or other mails, offered to sell or sold securities, or, directly or indirectly, carried or caused such securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale.

52.     By reason of the foregoing, New England directly or indirectly violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and is subject to liability under Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(l).

WHEREFORE, Plaintiffs and Class Members demand judgment for damages, including punitive damages, interest, costs, and such other and further relief to which they may show themselves justly entitled under the circumstances.

17

## COUNT III

## FRAUD IN THE OFFER OR SALE OF SECURITIES

53.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if fully set forth herein.

54.     New England failed to disclose to Plaintiffs and Class Members that the guarantees and promissory notes were not registered with the appropriate state and federal regulatory authorities.

55.     New England failed to disclose its lengthy regulatory history to the Plaintiffs and Class Members and failed to disclose that it was not licensed to sell insurance or guarantees in the various states.

56.     New England knew that the guarantees would be used to induce Plaintiffs and Class Members to purchase the promissory notes and to convey legitimacy to these notes. New England knew or was reckless in not knowing that Plaintiffs would believe that New England had investigated the companies issuing the promissory notes and had found them to be legitimate and financially sound. New England, however, failed to disclose that it had not performed any investigation of the companies issuing the promissory notes. New England did not disclose that the legitimacy that the guarantees conveyed to the promissory notes had no basis in fact in New England's own investigation of these notes.

57.     New England did not disclose to Plaintiffs and Class Members that it was also issuing guarantees for numerous other promissory notes and that it did not have sufficient

financial resources to back these guarantees in the event the companies issuing the promissory notes defaulted.

58.     These failures to disclose were material to Plaintiffs' and Class Members' decision to purchase the promissory notes and guarantees, and Plaintiffs and Class Members relied on these non-disclosures to their detriment, thereby suffering substantial losses.

59.     New England had a duty to disclose these additional facts to the Class Members, because it had represented to them that it had insured and guaranteed the promissory notes. To make these statements of guarantee not misleading, New England was required to disclose these additional facts.

60.     These non-disclosures of material fact were made as part of public offerings by means of prospectuses or oral communications.

61.     Plaintiffs and Class Members have only recently discovered New England's failures to disclose that (1) the guarantees and the promissory notes were not registered, (2) New England had a lengthy regulatory history, (3) New England was not licensed to sell insurance in the various states, (4) New England had not investigated the companies issuing the promissory notes and had not found them to be legitimate and financially sound, and (5) it had issued guarantees for numerous other promissory notes and did not have sufficient financial backing in the event the companies issuing these promissory notes defaulted.  In the exercise of reasonable diligence, Plaintiffs and Class Members had no reason to suspect that these non-disclosures had occurred.

19

62.     New England, by engaging in the conduct described in the paragraphs above, directly or indirectly, offered to sell or sold securities by the use of any means or instrument of transportation or communication in interstate commerce or of the United States mail, and by means of a prospectus or oral communication which omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

63.     By reason of the foregoing, New England directly or indirectly violated and is subject to liability under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2).

WHEREFORE, Plaintiffs and Class Members demand judgment for damages, including punitive damages, interest, costs, and such other and further relief to which they may show themselves justly entitled under the circumstances.

## COUNT IV

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

64.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if fully set forth herein.

65.     New England, as a sophisticated business entity, is presumed to know the law, and failed to disclose to Plaintiffs and Class Members that these securities were not registered.

66.     New England was familiar with its own regulatory history and its own lack of registration to sell insurance in the various states, but failed to disclose its regulatory history and lack of licensing to the Plaintiffs and Class Members.

20

67.     Because the purpose of the guarantees was to make the promissory notes marketable, New England knew that its guarantees would be used to convey an assurance of legitimacy to prospective investors.  New England, nevertheless, failed to disclose to prospective investors that it had not investigated the companies issuing the promissory notes and failed to disclose that the assurance of legitimacy which its guarantees provided to prospective investors had an inadequate basis in fact.

68.     New England knew that it had issued or would issue guarantees for numerous other companies' promissory notes which lacked financial backing.  New England, nevertheless, failed to disclose that its own resources were insufficient to satisfy all of these guarantees.  New England failed to disclose to Plaintiffs and Class Members the existence of the other guarantees and the inadequacy of its resources.

69.     These non-disclosures were made intentionally and knowingly or at least in reckless disregard of the facts known to New England.

70.     Plaintiffs and Class Members relied on New England's omissions to their detriment, thereby suffering substantial losses.

71.     New England, by engaging in the conduct described in the paragraphs above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, (1) employed devices, schemes, or artifices to defraud, (2) omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not

21

misleading, or (3) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

72.    By reason of the foregoing, New England directly or indirectly violated and is subject to liability under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10(b-5) thereunder, 17 C.F.R. § 240.10(b-5).

WHEREFORE, Plaintiffs and Class Members demand judgment for damages, including punitive damages, interest, costs, and such other and further relief to which they may show themselves justly entitled under the circumstances.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of Class Members, demand a jury trial of all issues so triable.

## CERTIFICATE OF SERVICE

I certify that a copy hereof was furnished to Joel Held, Esq., Arter and Hadden, 1717 Main Street, Suite 4100, Dallas, TX 75201-4605 and William Nortman, Esq. Atlas, Pearlman, 350 East Las Olas Blvd., Suite 1700, Fort Lauderdale, FL 3330, by U.S. Mail this 10th day of January, 2001.

Respectfully submitted,

Stephen Krosschell
Joel A. Goodman
Kalju Nekvasil
Goodman & Nekvasil, P.A.
14020 Roosevelt Blvd., Suite 808
Clearwater, FL 33762
(727) 524-8486
(727) 524-8786 (fax)

Attorneys for Plaintiffs

Greg Kehoe
John A. Yanchunis
James, Hoyer, Newcomer,
 & Smiljanich, P.A.
Florida Bar No.: 324681
4830 W. Kennedy Blvd., Suite 147
Tampa, FL 33609
(813) 286-4100
(813) 286-4174 (fax)

23

## CERTIFICATION OF PLAINTIFFS A. SIMPSON AND F. SIMPSON

Plaintiffs Angelina and Frank Simpson hereby state that:

1.     Plaintiffs have reviewed the attached Complaint and have authorized its filing.

2.     Plaintiffs did not purchase any of the securities that are subject of this Complaint at the direction of their counsel or in order to participate in this action.

3.     Plaintiffs are willing to serve as representative parties on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     The following includes Plaintiffs' transactions that are the subject of the Complaint during the class period specified in the Complaint:

| Plaintiff | Security | Dollar Amount | Date |
|-----------|----------|---------------|------|
| Frank Simpson | Pacific Air Transport, Inc. | $25,000 | 12/07/98 |
| Frank Simpson | Certificate of Guarantee | $25,000 | 12/22/98 |
| Angelina Simpson | Pacific Air Transport, Inc. | $25,000 | 12/07/98 |
| Angelina Simpson | Certificate of Guarantee | $25,000 | 12/22/98 |

5.     Plaintiffs have not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the three-year period preceding the date on which this certification was signed.

6.     Plaintiffs will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiffs' pro rata share of any recovery, except as ordered or

24

approved by the Court for the award of reasonable costs and expenses, including lost wages,

relating to the representation of the class.

Frank H. Simpson

Angelina L. Simpson

STATE OF FLORIDA

COUNTY OF PBoH

Sworn to and subscribed before me this 27 day of Dec. , 2000, by Frank H.
Simpson and Angelina L. Simpson.



Cynthia J. Roach
Commission # CC 951818
Expires Aug. 17, 2004
Bonded Thru
Atlantic Bonding Co., Inc.

Cynthia Roach
Notary Public
State of Florida

Personally known to me _____

or Produced identification _____

Type of identification produced: _____

25

## CERTIFICATION OF PLAINTIFF HUA

Plaintiff Ngoc Hoa Hua hereby states that:

1.     Plaintiff has reviewed the attached Complaint and has authorized its filing.

2.     Plaintiff did not purchase any of the securities that are subject of this Complaint

at the direction of her counsel or in order to participate in this action.

3.     Plaintiff is willing to serve as a representative party on behalf of a class, including

providing testimony at deposition and trial, if necessary.

4.     The following includes Plaintiff's transactions that are the subject of the

Complaint during the class period specified in the Complaint:

| Plaintiff | Security | Dollar Amount | Date |
|-----------|----------|---------------|------|
| Ngoc Hoa Hua | Pacific Air Transport, Inc. | $63,097.57 | 3/25/99 |
| Ngoc Hoa Hua | Certificate of Guarantee | $63,097.57 | 4/13/99 |

5.     Plaintiff has not served or sought to serve as a representative party on behalf of

a class under the federal securities laws during the three-year period preceding the date on

which this certification was signed.

6.     Plaintiff will not accept any payment for serving as a representative party on

behalf of the class beyond Plaintiffs' pro rata share of any recovery, except as ordered or

approved by the Court for the award of reasonable costs and expenses, including lost wages,

relating to the representation of the class.

_____
Ngoc Hoa Hua

26

STATE OF CALIFORNIA

COUNTY OF _Fresno_

Sworn to and subscribed before me this 27th day of _December_, 2000, by Ngoc Hoa Hua.

PATRICIA A. MARTIN
COMM. #1243686
NOTARY PUBLIC-CALIFORNIA
FRESNO COUNTY
My Comm. Exp. Nov. 26, 2003

_Patricia A. Martin_
Notary Public
State of California

Personally known to me _____

or Produced identification ___Yes___

Type of identification produced: _California Drivers License_

A. MARTIN
M. #1243686
UBLIC-CALIFORNIA
NO COUNTY
Nov. 26, 2003

27

## CERTIFICATION OF PLAINTIFF SULLIVAN

Plaintiff Carol A. Sullivan hereby states that:

1.      Plaintiff has reviewed the attached Complaint and has authorized its filing.

2.      Plaintiff did not purchase any of the securities that are subject of this Complaint at the direction of her counsel or in order to participate in this action.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The following includes Plaintiff's transactions that are the subject of the Complaint during the class period specified in the Complaint:

| Plaintiff | Security | Dollar Amount | Date |
|-----------|----------|---------------|------|
| Carol A. Sullivan | Digizap Technologies LLC | $25,000.00 | 5/19/99 |
| Carol A. Sullivan | Certificate of Guarantee | $25,000.00 | 5/27/99 |

5.      Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the three-year period preceding the date on which this certification was signed.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiffs' pro rata share of any recovery, except as ordered or approved by the Court for the award of reasonable costs and expenses, including lost wages, relating to the representation of the class.

Carol A. Sulllivan     12-29-00

28

STATE OF CALIFORNIA

COUNTY OF ___Solano___

     Sworn to and subscribed before me this _29th_ day of _December_ __, 2000, by Carol A. Sullivan.



Notary Public
State of California

Personally known to me _Carol A. Sullivan_

or Produced identification _n/a_____

Type of identification produced: _license__

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

## CERTIFICATE

**Certificate Number**     Pacific Air Transport 98018

**Amount of Loan**     $ 25,000.00

**Date of Investment**     07-December-1998

**Date of Issue**     22-December-1998

**Name of Lender**     Frank Simpson, Sr.

**Address of Lender**     170 Clint Finger Road
Saugeries, NY 12477

This certificate is given as evidence that New England International Surety Inc. has provided a guarantee of the above-referenced loan on the terms and conditions set forth in the Guarantee Agreement attached hereto as Exhibit A. This guarantee shall be valid only following execution by the above-referenced Lender of "Lender's Acknowledgment Of Receipt Of Guarantee Agreement and Consent To Be Bound By Its Terms," and only according to the terms and conditions set forth in the Guarantee Agreement.

Dated this 22nd day of December, 1998

NEW ENGLAND INTERNATIONAL SURETY, INC.

Hendrik Rienstra
Vice-President





EXHIBIT
A

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

## CERTIFICATE

| | |
|---|---|
| **Certificate Number** | Pacific Air Transport 98019 |
| **Amount of Loan** | $ 25,000.00 |
| **Date of Investment** | 07-December-1998 |
| **Date of Issue** | 22-December-1998 |
| **Name of Lender** | Angelina Simpson |
| **Address of Lender** | 170 Clint Finger Road Saugerties, NY 12477 |

This certificate is given as evidence that New England International Surety Inc. has provided a guarantee of the above-referenced loan on the terms and conditions set forth in the Guarantee Agreement attached hereto as Exhibit A. This guarantee shall be valid only following execution by the above-referenced Lender of "Lender's Acknowledgment Of Receipt Of Guarantee Agreement and Consent To Be Bound By Its Terms," and only according to the terms and conditions set forth in the Guarantee Agreement.

Dated this 22nd day of December, 1998

NEW ENGLAND INTERNATIONAL SURETY, INC.

Hendrik Rienstra
Vice-President



# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

### GUARANTEE AGREEMENT
### (Interest Included)

This Agreement is made and entered into as of the 5th day of October, 1998, by and between New England International Surety, Inc., (hereinafter the "Guarantor"), and PACIFIC AIR TRANSPORT INC. (hereinafter collectively "the Borrower"), and each lender to whom a guarantee of repayment is made under this agreement (hereinafter "the Lenders").

### RECITALS

1. Guarantor is a Panamanian corporation whose principal place of business is in Geneva, Switzerland. Guarantor is registered in the Geneva Commercial Register, under No. 11094. Under its by-laws, Guarantor is authorized to issue corporate guarantees.

2. Borrower is a California Corporation, with its principal place of business in Los Angeles, California.

3. Borrower desires to raise funds through the sale of Promissory Notes to Lenders and to use those funds for legitimate corporate purposes as described more fully below.

4. To enhance the marketability of Borrower's Promissory Notes, Borrower seeks to contract with Guarantor for issuance of a guarantee of repayment to each Lender purchasing the subject Promissory Notes.

5. Guarantor is willing to issue a guarantee of repayment to Lenders on the same terms and conditions set forth in this Agreement (hereinafter "the Guarantee").

In light of the foregoing and in consideration of the payments, promises, covenants, representations and warranties below, he parties agree as follows:



Brussels · Geneva · Bahrain · Rivadh · Paris · Athens

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

### I.    TERMS OF GUARANTEE

A. Guarantee. Subject to the terms and conditions of this Agreement, Guarantor undertakes to pay without protest any legitimate claim made upon the Borrower by the Lenders but only following the Borrower's failure to make any payment when due to the Lenders under the terms of the Promissory notes (hereinafter a "default") and the failure of Borrower to cure such default within thirty (30) days after receipt of Lenders' written notice of default to Borrower.

B. Certificate. The Guarantee shall be evidenced by a Certificate which shall be issued by Guarantor to each individual Lender upon written notice from Borrower certifying receipt of funds from Lender, the Lender's name, address, amount of loan and a copy of the executed promissory Note, and receipt by Guarantor of the fee due to Guarantor for the guarantee for each Lender.

C. Maximum Amount of Guarantee. Guarantor's liability under the Guarantee, including liability for principal and interest, to all Lenders shall be limited to and not exceed \$2,963,250 (Two Million Nine Hundred Sixty Three Thousand Two Hundred Fifty United States Dollars), this amount being the maximum of principal plus interest aggregate for 9 months. Guarantor's liability under the Guarantee, including liability for principal and interest, to any one Lender shall be limited to and shall not exceed the original principal of that Lender's Promissory note plus interest. The amount guaranteed includes interest at the rate set forth in the Promissory Notes, subject to the limitations above and in paragraph D below. Guarantor shall not be liable for any other amounts, including attorney's fees or costs.

D. Promissory Notes. The Promissory Notes issued to lenders by Borrower shall have a maturity at the time of issuance of not more than 274 days. The Promissory Notes shall bear interest at a rate not to exceed thirteen percent (13%) per annum, computed as simple interest, not compounded.

E. This Agreement Governs. The liability of Guarantor under this Guarantee shall be governed solely by the terms of this Agreement. In the event that the Promissory Notes issued by Borrower contain terms which differ from this Agreement, the provisions of this Agreement shall govern and control Guarantor's obligations.



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

F. <u>Duration of Guarantee.</u>   The Guarantee for each individual lender shall be valid for 274 days from the date of issuance of the Lender's Promissory Note, unless renewed.

G. · <u>Guarantee Not Transferable</u>.   This Guarantee and the Certificates issued thereunder are not divisible or transferable.

H. <u>Applicability of Borrower's Defenses</u>.   Any payment by Borrower or other circumstance, fact or event which would provide Borrower with a defense under the Promissory note shall operate to provide Guarantor with an equivalent defense under the Guarantee.

## II.   LENDERS' OBLIGATIONS

A. <u>Impairment of Collateral</u>.   If, under the terms of the Promissory Notes, Lenders are to receive any security interest in Borrower's property, receivables or other assets, Lenders shall promptly take any and all actions required to perfect and record such security interest in accordance with applicable law.   If any Lender fails to do so, Guarantor's obligation to Lender shall be void to the extent Lender's failure causes harm to Guarantor.

B. <u>Lender Fraud or Misrepresentation</u>.
Guarantor's obligation to any Lender shall be rendered null and void by fraud or material misrepresentations by the Lender or by the Lender's knowledge of or participation in fraud or material misrepresentation of Borrower, its officers, directors, promoters, affiliates, control persons or agents.

C. <u>No Reliance on Guarantor for Information</u>.   Lenders shall exercise reasonable prudence in connection with their purchase of Promissory Notes from Borrower.   Lenders represent and warrant that they have not relied on guarantor for any information or advice regarding Borrower, Borrower's business, financial condition, or proposed use of proceeds, and agree that Guarantor shall have no duty to advise Lenders of such information.



# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

D. Claims Procedure.

1. If Borrower fails to make any payment tot Lenders when due under the terms of the Promissory Notes, Lenders shall give written notice of such default to Borrower with a copy of such notice to Guarantor.

2. If Borrower fails to cure the default within thirty (30) days of receipt from Lenders of notice of default, Lenders shall give written Notice of Claim to Guarantor by certified mail, return receipt requested. Such Notice of Claim to Guarantor shall contain (a) a certified copy of the Lender's Promissory Note; (b) a certified copy of the Certificate received from Guarantor; and (c) a copy of Lender's notice of default to Borrower.

3. Upon receipt of Lender's Notice of Claim, Guarantor shall have sixty days to investigate the circumstances of Borrower's default. Guarantor shall not be responsible for any interest which accrues on Lender's Promissory Note during this sixty-day period. Following this sixty day period, Guarantor may, at its sole discretion, either (a) cure (interest payment defaults), or (b) repay, without prepayment penalty, interest or charge, other than payment of interest which accrued prior to the start of the sixty day period, Lender's principal balance, irrespective of the maturity date of the promissory Note. Guarantor shall make payment under either paragraph (a) or (b) above within seven days following expiration of the sixty-day period. In addition, at any time prior to maturity date of the note, Guarantor may elect to repay, without prepayment penalty, interest or charge other than that interest accrued prior to the date of repayment, Lender's principal balance irrespective of the maturity date of the Promissory Note.

4. Payments by Guarantor shall be in United States currency.

E. Guarantor's Right of Subrogation: Lenders' Duty of Cooperation. To the extent Guarantor makes payments to Lenders under the Guarantee, Guarantor shall be subrogated to all of the Lenders' right, title and interest in and to the Borrower's assets, and to all of Lenders' claims, rights, and causes of action against Borrower and all other persons arising out of or in connection with the Promissory Notes and/or the use of proceeds from the promissory Notes. Lenders shall take all steps reasonably necessary to preserve all such rights, titles, interests, claims and causes of action, and they shall do nothing to prejudice them. Guarantor's obligation

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

to a Lender shall be void if and to the extent the Lender's conduct impairs Guarantor's subrogation rights and Guarantor suffers a loss thereby.

At the request of Guarantor, Lenders shall execute and deliver all documents necessary to transfer, assign, and secure all such rights, interests, and claims to Guarantor. Lenders shall also cooperate with Guarantor as reasonably necessary to secure to Guarantor the benefits of its subrogation rights.

F.  Release of Borrower or Variation of Borrower's Obligation.  Lender's execution of a release, waiver or satisfaction of any right under the Promissory Notes shall render the Guarantee null and void and shall release Guarantor from obligation under the Guarantee. Also, without consent of Guarantor, any extensions of payment dates, renewals, or other changes to or modifications of the terms of the promissory Note after issued to Lender shall render the Guarantee null and void and shall release Guarantor from obligation under the Guarantee.

G.  Lender's Acknowledgement and Consent.  Guarantor's obligations under this Agreement shall not be effective as to any Lender until the Lender has executed and returned to Guarantor a witnessed copy of the Certificate.

## III.   DUTIES OF BORROWER

A.  REPORTS REGARDING USE OF PROCEEDS.  Within 20 days after the close of each month during the duration of the Guarantee, Borrower shall send to Guarantor by facsimile and mail and statement, certified by a competent officer, accurately setting forth the Borrower's use of Promissory Note proceeds for the prior month. Borrower shall provide such other information regarding its use of proceeds and its financial condition as Guarantor from time to time reasonably may request. In the event Borrower fails to provide such reports or information, Guarantor shall not be obligated to issue any additional certificates unless and until Borrower provides the reports or information.

B.  Borrower's Notice of Default to Guarantor.  In the event that Borrower fails to make any payments to Lenders as required (principal or interest) under the Promissory Notes, Borrower shall immediately so advise Guarantor in writing. Guarantor shall not be obligated to issue any additional Certificates unless and until Borrower cures any such defaults and provides Guarantor with adequate assurances that no further defaults will occur. The determination of whether Borrower's assurances are adequate rests solely in Guarantor's discretion.



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

IV.   BORROWER'S DUTIES JOINTLY AND SEVERALLY TO INDEMNIFY AND
HOLD HARMLESS THE GUARANTOR

A.   Indemnification.   Borrower(s) jointly and severally, shall indemnify and hold
harmless Guarantor against all actions, claims, liabilities, losses, damages, costs and expenses of
whatever kind or nature, including attorneys fees, expenses and costs incurred by or brought
against Guarantor by reason of the Guarantee or in defending or prosecuting any suit, action, or
other proceeding brought in connection therewith, or in obtaining or attempting to obtain a
release from liability in respect thereof.

B.   Payment on Demand.   Borrower(s) jointly and severally, shall pay forthwith on
demand all monies and liabilities which Guarantor pays or becomes liable to pay or which is
claimed or demanded from Guarantor by reason of the Guarantee, whether or not Guarantor shall
have paid out such sums or any part thereof at the time of demand.

C.   Authorization of Payment to Third Parties.   Borrower(s) hereby irrevocably authorize
Guarantor to pay any amounts demanded from Guarantor or which Guarantor may elect to pay or
may become liable to pay by reason of the Guarantee without notification to the Borrower.
Notwithstanding that Borrower may dispute the validity of any amount paid by Guarantor as set
forth above, Borrower agrees to repay Guarantor on written demand all amounts so paid by
Guarantor within ten days of said demand.

D.   Compromises   Guarantor may adjust, settle or compromise any claim, to Lender's
satisfaction  with respect to the Promissory Notes guaranteed, after notice to Borrower, unless
Borrower, at Borrower's expense, desires to litigate such claim, defend such suit, or appeal such
judgment and simultaneously therewith deposits with Guarantor collateral security sufficient to
pay any judgment rendered, with interest, costs, and expenses.   Guarantor's right to
indemnification under this agreement shall extend to any money paid by it in settlement or
compromise of such claims, suits and judgments.

D.   Legal Actions.   If any suit, action or other proceeding is brought by or against
Borrower in connection with the Promissory Notes guaranteed by Guarantor, Guarantor may, at
Borrowers' expense, either participate in or, at its election, assume the defense or prosecution of
such suit, action or proceeding.   In the latter event, Borrower may employ counsel and
participate therein.   If any suit, action, or other proceeding is brought by Guarantor against
Borrower for breach of its covenant of indemnity contained herein, separate suits may be brought

Brussels · Geneva · Bahrain · Riyadh · Paris · Athens

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

as causes of action accrue, without prejudice or bar to the bringing of subsequent proceedings on any other cause of causes of action.

## V.    FEES FOR GUARANTEE

The fee for this Guarantee and all individual Certificates issued hereunder shall be Five percent (5%) of the principal amount received from each Lender, plus interest payable to each Lender, for the initial term of the Guarantee. An additional fee of five percent (5%) of the principal and interest payable shall be required for each extension requested by Borrower if granted by Guarantor. The fee for each Certificate is due prior to the issuance of the Certificate and is non-refundable. In the event of non-payment of the fee or any renewal fee, the Guarantee is null and void as to any Lender for whom the fee has not been received. Guarantor agrees to issue the certificate within 5 working days after having been advised of payment.

## VI.    REPRESENTATIONS AND WARRANTIES

A. By Guarantor.  Guarantor represents and warrants that it has full authority to issue the Guarantee, and,that the officer signing this Agreement and all Certificates issued hereunder are authorized to act for the Guarantor.

B. By Borrower.

1. Authority.  Borrower represents and warrants that it has full authority to enter into this Agreement and to issue the Promissory Notes. Borrower further represents that is officers signing this Agreement and all Promissory Notes are authorized to act for the Borrower.

2. Use of Proceeds.  Borrower represents and warrants that the proceeds from the sale of the Promissory Notes shall be used only as follows:

    a. To pay required fees to Guarantor.

    b. To pay commissions to bona fide third party brokers for their services in connection with the marketing of the Promissory Notes.



Brussels · Geneva · Bahrain · Rivadh · Paris · Athens

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

    c. Not less than Seventy-Five percent (75%) of the Promissory Note proceeds shall be used by Borrower for business purposes as described in his business plan at the outset.

    3. Compliance with Law. Borrower represents and warrants to the best of his knowledge and belief that the Promissory notes which are the subject of the Guarantee and the methods by which Borrower will market and sell the Promissory Notes and all representations, written or verbal, to be made by Borrower or its sales agents in connection with the marketing of the Promissory Notes, fully comply with all applicable laws, rules and regulations, including but not limited to all securities laws of the Untied States and or any jurisdiction in which the Promissory Notes are marketed and sold.

    4. Guarantee Unavailable from Other Sources. Borrower understands and acknowledges that Guarantor is not licensed in the United States. Borrower represents and warrants that it has been unable to obtain this Guarantee from any other source.

## VII. MISCELLANEOUS

    A. Choice of Law. This Agreement and all rights and obligations hereunder shall be governed by and construed according to the internal laws of the State of New York.

    C. Mandatory Arbitration of Disputes: Litigation Prohibited. All disputes arising under or in connection with this Agreement, whether involving the claims or rights of Borrower, Lenders and/or Guarantor, and whether arising under common law, statute or rule, and whether sounding in contract or tort, shall be resolved through mandatory, binding, arbitration. The place of arbitration shall be New York, New York. The arbitration shall be conducted under the rules and auspices of the American Arbitration Association, or such other alternative dispute resolution services provided as the parties to the dispute mutually shall agree.

    All parties acknowledge and agree that arbitration of disputes is preferable to litigation. Accordingly, if any party initiates litigation of any claim arising under or in connection with this Agreement, such litigation shall be subject to immediate dismissal at the request of the other parties to the dispute and the party initiating such litigation shall be liable for the other parties' costs and reasonable attorneys fees incurred in connection with such litigation.

    C. Integration. No Modification Except in Writing. This Agreement contains the entire agreement between and among the parties regarding Guarantor and/or the guarantee. It

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

supersedes all prior oral or written agreements regarding its subject matter. There are no promises, representations or agreements involving Guarantor and/or the guarantee which are not expressly stated in this Agreement. This agreement may not be modified, except by a subsequent writing, signed by all parties.

D. Notices. All notices required under this Agreement and all demands for arbitration, shall be given by Certified mail, return receipt requested, to the following:

*TO BORROWER:*
PACIFIC AIR TRANSPORT, INC.
12304 Santa Monica Boulevard, Suite 116, Los Angeles, CA 90025

*TO GUARANTOR:*
NEW ENGLAND INTERNATIONAL SURETY INC.
11 Avenue Lloyd George
Brussels, 1000, Belgium

*TO LENDER:*
The Address Contained in the Certificate.

*"BORROWER"*
PACIFIC AIR TRANSPORT, INC.

By _____
(Signature)
Printed Name ROBERT B. HIRSCH
Title CEO

"GUARANTOR"
NEW ENGLAND INTERNATIONAL SURETY, INC.

By _____
(Signature)
Printed Name _____
Title _____

o



# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

## CERTIFICATE

| | |
|---|---|
| **Certificate Number** | Pacific Air Transport 99222 |
| **Amount of Loan** | $ 63,097.57 |
| **Date of Investment** | 25-March-1999 |
| **Date of Issue** | 13-April-1999 |
| **Name of Lender** | Ngoc Hoa Hua |
| **Address of Lender** | 240 W. Portland Ave. |
| | Fresno, CA 93711-6042 |

This certificate is given as evidence that New England International Surety Inc. has provided a guarantee of the above-referenced loan on the terms and conditions set forth in the Guarantee Agreement attached hereto as Exhibit A. This guarantee shall be valid only following execution by the above-referenced Lender of "Lender's Acknowledgment Of Receipt Of Guarantee Agreement and Consent To Be Bound By Its Terms," and only according to the terms and conditions set forth in the Guarantee Agreement.

Dated this 13th day of April, 1999

NEW ENGLAND INTERNATIONAL SURETY, INC.

Hendrik Rienstra
Vice-President

**EXHIBIT**

B

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

## GUARANTEE AGREEMENT
### (Interest Included)

This Agreement is made and entered into as of the 5th day of October, 1998, by and between New England International Surety, Inc., (hereinafter the "Guarantor"), and PACIFIC AIR TRANSPORT INC. (hereinafter collectively "the Borrower"), and each lender to whom a guarantee of repayment is made under this agreement (hereinafter "the Lenders").

## RECITALS

1. Guarantor is a Panamanian corporation whose principal place of business is in Geneva, Switzerland. Guarantor is registered in the Geneva Commercial Register, under No. 11094. Under its by-laws, Guarantor is authorized to issue corporate guarantees.

2. Borrower is a California Corporation, with its principal place of business in Los Angeles, California.

3. Borrower desires to raise funds through the sale of Promissory Notes to Lenders and to use those funds for legitimate corporate purposes as described more fully below.

4. To enhance the marketability of Borrower's Promissory Notes, Borrower seeks to contract with Guarantor for issuance of a guarantee of repayment to each Lender purchasing the subject Promissory Notes.

5. Guarantor is willing to issue a guarantee of repayment to Lenders on the same terms and conditions set forth in this Agreement (hereinafter "the Guarantee").

In light of the foregoing and in consideration of the payments, promises, covenants, representations and warranties below, he parties agree as follows:



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens
Capital US$ 50 000 000 · R.C. 11094/1994

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

## I. TERMS OF GUARANTEE

A. Guarantee. Subject to the terms and conditions of this Agreement, Guarantor undertakes to pay without protest any legitimate claim made upon the Borrower by the Lenders but only following the Borrower's failure to make any payment when due to the Lenders under the terms of the Promissory notes (hereinafter a "default") and the failure of Borrower to cure such default within thirty (30) days after receipt of Lenders' written notice of default to Borrower.

B. Certificate. The Guarantee shall be evidenced by a Certificate which shall be issued by Guarantor to each individual Lender upon written notice from Borrower certifying receipt of funds from Lender, the Lender's name, address, amount of loan and a copy of the executed promissory Note, and receipt by Guarantor of the fee due to Guarantor for the guarantee for each Lender.

C. Maximum Amount of Guarantee. Guarantor's liability under the Guarantee, including liability for principal and interest, to all Lenders shall be limited to and not exceed $2,963,250 (Two Million Nine Hundred Sixty Three Thousand Two Hundred Fifty United States Dollars), this amount being the maximum of principal plus interest aggregate for 9 months. Guarantor's liability under the Guarantee, including liability for principal and interest, to any one Lender shall be limited to and shall not exceed the original principal of that Lender's Promissory note plus interest. The amount guaranteed includes interest at the rate set forth in the Promissory Notes, subject to the limitations above and in paragraph D below. Guarantor shall not be liable for any other amounts, including attorney's fees or costs.

D. Promissory Notes. The Promissory Notes issued to lenders by Borrower shall have a maturity at the time of issuance of not more than 274 days. The Promissory Notes shall bear interest at a rate not to exceed thirteen percent (13%) per annum, computed as simple interest, not compounded.

E. This Agreement Governs. The liability of Guarantor under this Guarantee shall be governed solely by the terms of this Agreement. In the event that the Promissory Notes issued by Borrower contain terms which differ from this Agreement, the provisions of this Agreement shall govern and control Guarantor's obligations.



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens
Capital US$ 50 000 000 · R.C. 11094/1994

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

F. Duration of Guarantee.    The Guarantee for each individual lender shall be valid for 274 days from the date of issuance of the Lender's Promissory Note, unless renewed.

G. Guarantee Not Transferable.    This Guarantee and the Certificates issued thereunder are not divisible or transferable.

H. Applicability of Borrower's Defenses.    Any payment by Borrower or other circumstance, fact or event which would provide Borrower with a defense under the Promissory note shall operate to provide Guarantor with an equivalent defense under the Guarantee.

## II.    LENDERS' OBLIGATIONS

A. Impairment of Collateral. If, under the terms of the Promissory Notes, Lenders are to receive any security interest in Borrower's property, receivables or other assets, Lenders shall promptly take any and all actions required to perfect and record such security interest in accordance with applicable law. If any Lender fails to do so, Guarantor's obligation to Lender shall be void to the extent Lender's failure causes harm to Guarantor.

B. Lender Fraud or Misrepresentation.
Guarantor's obligation to any Lender shall be rendered null and void by fraud or material misrepresentations by the Lender or by the Lender's knowledge of or participation in fraud or material misrepresentation of Borrower, its officers, directors, promoters, affiliates, control persons or agents.

C. No Reliance on Guarantor for Information. Lenders shall exercise reasonable prudence in connection with their purchase of Promissory Notes from Borrower. Lenders represent and warrant that they have not relied on guarantor for any information or advice regarding Borrower, Borrower's business, financial condition, or proposed use of proceeds, and agree that Guarantor shall have no duty to advise Lenders of such information.



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens
Capital US$ 50 000 000 · R.C. 11094/1994

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

D. Claims Procedure.

1. If Borrower fails to make any payment tot Lenders when due under the terms of the Promissory Notes, Lenders shall give written notice of such default to Borrower with a copy of such notice to Guarantor.

2. If Borrower fails to cure the default within thirty (30) days of receipt from Lenders of notice of default, Lenders shall give written Notice of Claim to Guarantor by certified mail, return receipt requested. Such Notice of Claim to Guarantor shall contain (a) a certified copy of the Lender's Promissory Note; (b) a certified copy of the Certificate received from Guarantor; and (c) a copy of Lender's notice of default to Borrower.

3. Upon receipt of Lender's Notice of Claim, Guarantor shall have sixty days to investigate the circumstances of Borrower's default. Guarantor shall not be responsible for any interest which accrues on Lender's Promissory Note during this sixty-day period. Following this sixty day period, Guarantor may, at its sole discretion, either (a) cure (interest payment defaults), or (b) repay, without prepayment penalty, interest or charge, other than payment of interest which accrued prior to the start of the sixty day period, Lender's principal balance, irrespective of the maturity date of the promissory Note. Guarantor shall make payment under either paragraph (a) or (b) above within seven days following expiration of the sixty-day period. In addition, at any time prior to maturity date of the note, Guarantor may elect to repay, without prepayment penalty, interest or charge other than that interest accrued prior to the date of repayment, Lender's principal balance irrespective of the maturity date of the Promissory Note.

4. Payments by Guarantor shall be in United States currency.

E. Guarantor's Right of Subrogation: Lenders' Duty of Cooperation. To the extent Guarantor makes payments to Lenders under the Guarantee, Guarantor shall be subrogated to all of the Lenders' right, title and interest in and to the Borrower's assets, and to all of Lenders' claims, rights, and causes of action against Borrower and all other persons arising out of or in connection with the Promissory Notes and/or the use of proceeds from the promissory Notes. Lenders shall take all steps reasonably necessary to preserve all such rights, titles, interests, claims and causes of action, and they shall do nothing to prejudice them. Guarantor's obligation



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens
Capital US$ 50 000 000 · R.C. 11094/1994

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

to a Lender shall be void if and to the extent the Lender's conduct impairs Guarantor's subrogation rights and Guarantor suffers a loss thereby.

At the request of Guarantor, Lenders shall execute and deliver all documents necessary to transfer, assign, and secure all such rights, interests, and claims to Guarantor. Lenders shall also cooperate with Guarantor as reasonably necessary to secure to Guarantor the benefits of its subrogation rights.

F. Release of Borrower or Variation of Borrower's Obligation. Lender's execution of a release, waiver or satisfaction of any right under the Promissory Notes shall render the Guarantee null and void and shall release Guarantor from obligation under the Guarantee. Also, without consent of Guarantor, any extensions of payment dates, renewals, or other changes to or modifications of the terms of the promissory Note after issued to Lender shall render the Guarantee null and void and shall release Guarantor from obligation under the Guarantee.

G. Lender's Acknowledgement and Consent. Guarantor's obligations under this Agreement shall not be effective as to any Lender until the Lender has executed and returned to Guarantor a witnessed copy of the Certificate.

## III.   DUTIES OF BORROWER

A. REPORTS REGARDING USE OF PROCEEDS. Within 20 days after the close of each month during the duration of the Guarantee, Borrower will send to Guarantor by facsimile and mail and statement, certified by a competent officer, accurately setting forth the Borrower's use of Promissory Note proceeds for the prior month. Borrower shall provide such other information regarding its use of proceeds and its financial condition as Guarantor from time to time reasonably may request. In the event Borrower fails to provide such reports or information, Guarantor shall not be obligated to issue any additional certificates unless and until Borrower provides the reports or information.

B. Borrower's Notice of Default to Guarantor. In the event that Borrower fails to make any payments to Lenders as required (principal or interest) under the Promissory Notes, Borrower shall immediately so advise Guarantor in writing. Guarantor shall not be obligated to issue any additional Certificates unless and until Borrower cures any such defaults and provides Guarantor with adequate assurances that no further defaults will occur. The determination of whether Borrower's assurances are adequate rests solely in Guarantor's discretion.



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens
Capital US$ 50 000 000 · R.C. 11094/1994

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

## IV.   BORROWER'S DUTIES JOINTLY AND SEVERALLY TO INDEMNIFY AND HOLD HARMLESS THE GUARANTOR

A.   Indemnification.     Borrower(s) jointly and severally, shall indemnify and hold harmless Guarantor against all actions, claims, liabilities, losses, damages, costs and expenses of whatever kind or nature, including attorneys fees, expenses and costs incurred by or brought against Guarantor by reason of the Guarantee or in defending or prosecuting any suit, action, or other proceeding brought in connection therewith, or in obtaining or attempting to obtain a release from liability in respect thereof.

B.   Payment on Demand.     Borrower(s) jointly and severally, shall pay forthwith on demand all monies and liabilities which Guarantor pays or becomes liable to pay or which is claimed or demanded from Guarantor by reason of the Guarantee, whether or not Guarantor shall have paid out such sums or any part thereof at the time of demand.

C.   Authorization of Payment to Third Parties.   Borrower(s) hereby irrevocably authorize Guarantor to pay any amounts demanded from Guarantor or which Guarantor may elect to pay or may become liable to pay by reason of the Guarantee without notification to the Borrower. Notwithstanding that Borrower may dispute the validity of any amount paid by Guarantor as set forth above, Borrower agrees to repay Guarantor on written demand all amounts so paid by Guarantor within ten days of said demand.

D.   Compromises   Guarantor may adjust, settle or compromise any claim, to Lender's satisfaction  with respect to the Promissory Notes guaranteed, after notice to Borrower, unless Borrower, at Borrower's expense, desires to litigate such claim, defend such suit, or appeal such judgment and simultaneously therewith deposits with Guarantor collateral security sufficient to pay any judgment rendered, with interest, costs, and expenses.   Guarantor's right to indemnification under this agreement shall extend to any money paid by it in settlement or compromise of such claims, suits and judgments.

D.   Legal Actions.   If any suit, action or other proceeding is brought by or against Borrower in connection with the Promissory Notes guaranteed by Guarantor, Guarantor may, at Borrowers' expense, either participate in or, at its election, assume the defense or prosecution of such suit, action or proceeding.   In the latter event, Borrower may employ counsel and participate therein.   If any suit, action, or other proceeding is brought by Guarantor against Borrower for breach of its covenant of indemnity contained herein, separate suits may be brought

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

as causes of action accrue, without prejudice or bar to the bringing of subsequent proceedings on any other cause of causes of action.

## V.   FEES FOR GUARANTEE

The fee for this Guarantee and all individual Certificates issued hereunder shall be Five percent (5%) of the principal amount received from each Lender, plus interest payable to each Lender, for the initial term of the Guarantee. An additional fee of five percent (5%) of the principal and interest payable shall be required for each extension requested by Borrower if granted by Guarantor. The fee for each Certificate is due prior to the issuance of the Certificate and is non-refundable. In the event of non-payment of the fee or any renewal fee, the Guarantee is null and void as to any Lender for whom the fee has not been received. Guarantor agrees to issue the certificate within 5 working days after having been advised of payment.

## VI.   REPRESENTATIONS AND WARRANTIES

A. By Guarantor.  Guarantor represents and warrants that it has full authority to issue the Guarantee, and,that the officer signing this Agreement and all Certificates issued hereunder are authorized to act for the Guarantor.

B. By Borrower.

1. Authority.  Borrower represents and warrants that it has full authority to enter into this Agreement and to issue the Promissory Notes. Borrower further represents that is officers signing this Agreement and all Promissory Notes are authorized to act for the Borrower.

2. Use of Proceeds.  Borrower represents and warrants that the proceeds from the sale of the Promissory Notes shall be used only as follows:

    a. To pay required fees to Guarantor.

    b. To pay commissions to bona fide third party brokers for their services in connection with the marketing of the Promissory Notes.



Brussels · Geneva · Bahrain · Riyadh · Paris · Athens
Capital US$ 50 000 000 · R.C. 11094/1994

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH-1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

    c. Not less than Seventy-Five percent (75%) of the Promissory Note proceeds shall be used by Borrower for business purposes as described in his business plan at the outset.

    3. <u>Compliance with Law.</u> Borrower represents and warrants to the best of his knowledge and belief that the Promissory notes which are the subject of the Guarantee and the methods by which Borrower will market and sell the Promissory Notes and all representations, written or verbal, to be made by Borrower or its sales agents in connection with the marketing of the Promissory Notes, fully comply with all applicable laws, rules and regulations, including but not limited to all securities laws of the Untied States and or any jurisdiction in which the Promissory Notes are marketed and sold.

    4. <u>Guarantee Unavailable from Other Sources.</u> Borrower understands and acknowledges that Guarantor is not licensed in the United States. Borrower represents and warrants that it has been unable to obtain this Guarantee from any other source.

## VII.   MISCELLANEOUS

    A. <u>Choice of Law.</u> This Agreement and all rights and obligations hereunder shall be governed by and construed according to the internal laws of the State of New York.

    C. <u>Mandatory Arbitration of Disputes: Litigation Prohibited.</u> All disputes arising under or in connection with this Agreement, whether involving the claims or rights of Borrower, Lenders and/or Guarantor, and whether arising under common law, statute or rule, and whether sounding in contract or tort, shall be resolved through mandatory, binding, arbitration. The place of arbitration shall be New York, New York. The arbitration shall be conducted under the rules and auspices of the American Arbitration Association, or such other alternative dispute resolution services provided as the parties to the dispute mutually shall agree.

    All parties acknowledge and agree that arbitration of disputes is preferable to litigation. Accordingly, if any party initiates litigation of any claim arising under or in connection with this Agreement, such litigation shall be subject to immediate dismissal at the request of the other parties to the dispute and the party initiating such litigation shall be liable for the other parties' costs and reasonable attorneys fees incurred in connection with such litigation.

    C. <u>Integration. No Modification Except in Writing.</u> This Agreement contains the entire agreement between and among the parties regarding Guarantor and/or the guarantee. It

# NEW ENGLAND INTERNATIONAL SURETY INC.

7, rue des Alpes · CH·1201 Geneva · Switzerland
Telephone 41-22/732 97 82 · Fax 41-22/731 79 43

supersedes all prior oral or written agreements regarding its subject matter. There are no promises, representations or agreements involving Guarantor and/or the guarantee which are not expressly stated in this Agreement. This agreement may not be modified, except by a subsequent writing, signed by all parties.

D. Notices. All notices required under this Agreement and all demands for arbitration, shall be given by Certified mail, return receipt requested, to the following:

*TO BORROWER:*
PACIFIC AIR TRANSPORT, INC.
12304 Santa Monica Boulevard, Suite 116, Los Angeles, CA 90025

*TO GUARANTOR:*
NEW ENGLAND INTERNATIONAL SURETY INC.
11 Avenue Lloyd George
Brussels, 1000, Belgium

*TO LENDER:*
The Address Contained in the Certificate.

*"BORROWER"*
PACIFIC AIR TRANSPORT, INC.

By _____
(Signature)
Printed Name ROBERT B. HIRSch
Title C.E O

"GUARANTOR"
NEW ENGLAND INTERNATIONAL SURETY, INC.

By _____
(Signature)
Printed Name _____
Title _____



# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

## CERTIFICATE

**Certificate Number**      Digizap 99024

**Amount of Loan**       $ 25,000.00

**Date of Investment**     19-May-1999

**Date of Issue**       27-May-1999

**Name of Lender**      Carol A. Sullivan

**Address of Lender**     2261 North Texas St. #6
                  Fairfield, CA 94533

This certificate is given as evidence that New England International Surety Inc. has provided a guarantee of the above-referenced loan on the terms and conditions set forth in the Guarantee Agreement attached hereto as Exhibit A. This guarantee shall be valid only following execution by the above-referenced Lender of "Lender's Acknowledgment Of Receipt Of Guarantee Agreement and Consent To Be Bound By Its Terms," and only according to the terms and conditions set forth in the Guarantee Agreement.

Dated this 27th day of May, 1999

NEW ENGLAND INTERNATIONAL SURETY, INC.

Hendrik Rienstra
Vice-President





EXHIBIT

C

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

### GUARANTEE AGREEMENT
### (Interest Included)

This Agreement is made and entered into as of the 8th day of December, 1998, by and between New England International Surety, Inc., (hereinafter the "Guarantor"), and DIGIZAP TECHNOLOGIES LLC (hereinafter collectively "the Borrower"), and each lender to whom a guarantee of repayment is made under this agreement (hereinafter "the Lenders").

### RECITALS

1. Guarantor is a Panamanian corporation whose principal place of business is in Geneva, Switzerland. Guarantor is registered in the Geneva Commercial Register, under No. 11094. Under its by-laws, Guarantor is authorized to issue corporate guarantees.

2. Borrower is a Californian Corporation, with its principal place of business in Manhattan Beach.

3. Borrower desires to raise funds through the sale of Promissory Notes to Lenders and to use those funds for legitimate corporate purposes as described more fully below.

4. To enhance the marketability of Borrower's Promissory Notes, Borrower seeks to contract with Guarantor for issuance of a guarantee of repayment to each Lender purchasing the subject Promissory Notes.

5. Guarantor is willing to issue a guarantee of repayment to Lenders on the same terms and conditions set forth in this Agreement (hereinafter "the Guarantee").

In light of the foregoing and in consideration of the payments, promises, covenants, representations and warranties below, he parties agree as follows:



1



# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

---

## I.   TERMS OF GUARANTEE

A. Guarantee.   Subject to the terms and conditions of this Agreement, Guarantor
undertakes to pay without protest any legitimate claim made upon the Borrower by the Lenders
but only following the Borrower's failure to make any payment when due to the Lenders under
the terms of the Promissory notes (hereinafter a "default") and the failure of Borrower to cure
such default within thirty (30) days after receipt of Lenders' written notice of default to
Borrower.

B. Certificate.   The Guarantee shall be evidenced by a Certificate which shall be issued
by Guarantor to each individual Lender upon written notice from Borrower certifying receipt of
funds from Lender, the Lender's name, address, amount of loan and a copy of the executed
promissory Note, and receipt by Guarantor of the fee due to Guarantor for the guarantee for each
Lender.

C. Maximum Amount of Guarantee.   Guarantor's liability under the Guarantee,
including liability for principal and interest, to all Lenders shall be limited to and not exceed
$3,000,000 (Three Million United States Dollars), this amount being the maximum of principal
plus interest aggregate for 9 months. Guarantor's liability under the Guarantee, including liability
for principal and interest, to any one Lender shall be limited to and shall not exceed the original
principal of that Lender's Promissory note plus interest. The amount guaranteed includes
interest at the rate set forth in the Promissory Notes, subject to the limitations above and in
paragraph D below. Guarantor shall not be liable for any other amounts, including attorney's
fees or costs.

D. Promissory Notes.   The Promissory Notes issued to lenders by Borrower shall have
a maturity at the time of issuance of not more than 274 days. The Promissory Notes shall bear
interest at a rate not to exceed thirteen percent (13%) per annum, computed as simple interest,
not compounded.

E. This Agreement Governs.   The liability of Guarantor under this Guarantee shall be
governed solely by the terms of this Agreement. In the event that the Promissory Notes issued
by Borrower contain terms which differ from this Agreement, the provisions of this Agreement
shall govern and control Guarantor's obligations.



2

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

  F. <u>Duration of Guarantee.</u> The Guarantee for each individual lender shall be valid for 274 days from the date of issuance of the Lender's Promissory Note, unless renewed.

  G. <u>Guarantee Not Transferable</u>. This Guarantee and the Certificates issued thereunder are not divisible or transferable.

  H. <u>Applicability of Borrower's Defenses</u>. Any payment by Borrower or other circumstance, fact or event which would provide Borrower with a defense under the Promissory note shall operate to provide Guarantor with an equivalent defense under the Guarantee.

## II. LENDERS' OBLIGATIONS

  A. <u>Impairment of Collateral</u>. If, under the terms of the Promissory Notes, Lenders are to receive any security interest in Borrower's property, receivables or other assets, Lenders shall promptly take any and all actions required to perfect and record such security interest in accordance with applicable law. If any Lender fails to do so, Guarantor's obligation to Lender shall be void to the extent Lender's failure causes harm to Guarantor.

  B. <u>Lender Fraud or Misrepresentation</u>.
Guarantor's obligation to any Lender shall be rendered null and void by fraud or material misrepresentations by the Lender or by the Lender's knowledge of or participation in fraud or material misrepresentation of Borrower, its officers, directors, promoters, affiliates, control persons or agents.

  C. <u>No Reliance on Guarantor for Information</u>. Lenders shall exercise reasonable prudence in connection with their purchase of Promissory Notes from Borrower. Lenders represent and warrant that they have not relied on guarantor for any information or advice regarding Borrower, Borrower's business, financial condition, or proposed use of proceeds, and agree that Guarantor shall have no duty to advise Lenders of such information.



3

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel. 32-2-646 21 40 · Fax 32-2-648 32 86 · E-Mail: omnee@hebel.net

D. Claims Procedure.

1. If Borrower fails to make any payment tot Lenders when due under the terms of the Promissory Notes. Lenders shall give written notice of such default to Borrower with a copy of such notice to Guarantor.

2. If Borrower fails to cure the default within thirty (30) days of receipt from Lenders of notice of default, Lenders shall give written Notice of Claim to Guarantor by certified mail, return receipt requested. Such Notice of Claim to Guarantor shall contain (a) a certified copy of the Lender's Promissory Note; (b) a certified copy of the Certificate received from Guarantor; and (c) a copy of Lender's notice of default to Borrower.

3. Upon receipt of Lender's Notice of Claim, Guarantor shall have sixty days to investigate the circumstances of Borrower's default. Guarantor shall not be responsible for any interest which accrues on Lender's Promissory Note during this sixty-day period. Following this sixty day period, Guarantor may, at its sole discretion, either (a) cure (interest payment defaults), or (b) repay, without prepayment penalty, interest or charge, other than payment of interest which accrued prior to the start of the sixty day period, Lender's principal balance, irrespective of the maturity date of the promissory Note. Guarantor shall make payment under either paragraph (a) or (b) above within seven days following expiration of the sixty-day period. In addition, at any time prior to maturity date of the note, Guarantor may elect to repay, without prepayment penalty, interest or charge other than that interest accrued prior to the date of repayment, Lender's principal balance irrespective of the maturity date of the Promissory Note.

4. Payments by Guarantor shall be in United States currency.

E. Guarantor's Right of Subrogation: Lenders' Duty of Cooperation. To the extent Guarantor makes payments to Lenders under the Guarantee, Guarantor shall be subrogated to all of the Lenders' right, title and interest in and to the Borrower's assets, and to all of Lenders' claims, rights, and causes of action against Borrower and all other persons arising out of or in connection with the Promissory Notes and/or the use of proceeds from the promissory Notes. Lenders shall take all steps reasonably necessary to preserve all such rights, titles, interests, claims and causes of action, and they shall do nothing to prejudice them. Guarantor's obligation



4

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel · 32-2-646 21 40 · Fax 32-2-645 32 86 · E-Mail: omnere@hebel.net

to a Lender shall be void if and to the extent the Lender's conduct impairs Guarantor's subrogation rights and Guarantor suffers a loss thereby.

At the request of Guarantor, Lenders shall execute and deliver all documents necessary to transfer, assign, and secure all such rights, interests, and claims to Guarantor. Lenders shall also cooperate with Guarantor as reasonably necessary to secure to Guarantor the benefits of its subrogation rights.

F. Release of Borrower or Variation of Borrower's Obligation. Lender's execution of a release, waiver or satisfaction of any right under the Promisory Notes shall render the Guarantee null and void and shall release Guarantor from obligation under the Guarantee. Also, without consent of Guarantor, any extensions of payment dates, renewals, or other changes to or modifications of the terms of the promissory Note after issued to Lender shall render the Guarantee null and void and shall release Guarantor from obligation under the Guarantee.

G. Lender's Acknowledgement and Consent. Guarantor's obligations under this Agreement shall not be effective as to any Lender until the Lender has executed and returned to Guarantor a witnessed copy of the Certificate.

## III.   DUTIES OF BORROWER

A. REPORTS REGARDING USE OF PROCEEDS. Within 20 days after the close of each month during the duration of the Guarantee, Borrower will send to Guarantor by facsimile and mail and statement, certified by a competent officer, accurately setting forth the Borrower's use of Promissory Note proceeds for the prior month. Borrower shall provide such other information regarding its use of proceeds and its financial condition as Guarantor from time to time reasonably may request. In the event Borrower fails to provide such reports or information, Guarantor shall not be obligated to issue any additional certificates unless and until Borrower provides the reports or information.

B. Borrower's Notice of Default to Guarantor. In the event that Borrower fails to make any payments to Lenders as required (principal or interest) under the Promissory Notes. Borrower shall immediately so advise Guarantor in writing. Guarantor shall not be obligated to issue any additional Certificates unless and until Borrower cures any such defaults and provides Guarantor with adequate assurances that no further defaults will occur. The determination of whether Borrower's assurances are adequate rests solely in Guarantor's discretion.



5

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omns Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: ommere@hebol.net

## IV.   BORROWER'S DUTIES JOINTLY AND SEVERALLY TO INDEMNIFY AND HOLD HARMLESS THE GUARANTOR

A. Indemnification.   Borrower(s) jointly and severally, shall indemnify and hold harmless Guarantor against all actions, claims, liabilities, losses, damages, costs and expenses of whatever kind or nature, including attorneys fees, expenses and costs incurred by or brought against Guarantor by reason of the Guarantee or in defending or prosecuting any suit, action, or other proceeding brought in connection therewith, or in obtaining or attempting to obtain a release from liability in respect thereof.

B. Payment on Demand.   Borrower(s) jointly and severally, shall pay forthwith on demand all monies and liabilities which Guarantor pays or becomes liable to pay or which is claimed or demanded from Guarantor by reason of the Guarantee, whether or not Guarantor shall have paid out such sums or any part thereof at the time of demand.

C. Authorization of Payment to Third Parties.   Borrower(s) hereby irrevocably authorize Guarantor to pay any amounts demanded from Guarantor or which Guarantor may elect to pay or may become liable to pay by reason of the Guarantee without notification to the Borrower. Notwithstanding that Borrower may dispute the validity of any amount paid by Guarantor as set forth above, Borrower agrees to repay Guarantor on written demand all amounts so paid by Guarantor within ten days of said demand.

D. Compromises   Guarantor may adjust, settle or compromise any claim, to Lender's satisfaction with respect to the Promissory Notes guaranteed, after notice to Borrower, unless Borrower, at Borrower's expense, desires to litigate such claim, defend such suit, or appeal such judgment and simultaneously therewith deposits with Guarantor collateral security sufficient to pay any judgment rendered, with interest, costs, and expenses.   Guarantor's right to indemnification under this agreement shall extend to any money paid by it in settlement or compromise of such claims, suits and judgments.

D. Legal Actions.   If any suit, action or other proceeding is brought by or against Borrower in connection with the Promissory Notes guaranteed by Guarantor, Guarantor may, at Borrowers' expense, either participate in or, at its election, assume the defense or prosecution of such suit, action or proceeding.   In the latter event, Borrower may employ counsel and participate therein.   If any suit, action, or other proceeding is brought by Guarantor against Borrower for breach of its covenant of indemnity contained herein, separate suits may be brought



6

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George. 1000 Brussels-Belgium
Tel: 32-2-648 21 40  Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

as causes of action accrue, without prejudice or bar to the bringing of subsequent proceedings on any other cause of causes of action.

## V.    FEES FOR GUARANTEE

The fee for this Guarantee and all individual Certificates issued hereunder shall be Five percent (5%) of the principal amount received from each Lender, plus interest payable to each Lender, for the initial term of the Guarantee. An additional fee of five percent (5%) of the principal and interest payable shall be required for each extension requested by Borrower if granted by Guarantor. The fee for each Certificate is due prior to the issuance of the Certificate and is non-refundable. In the event of non-payment of the fee or any renewal fee, the Guarantee is null and void as to any Lender for whom the fee has not been received. Guarantor agrees to issue the certificate within 5 working days after having been advised of payment.

## VI.    REPRESENTATIONS AND WARRANTIES

A. By Guarantor.  Guarantor represents and warrants that it has full authority to issue the Guarantee, and that the officer signing this Agreement and all Certificates issued hereunder are authorized to act for the Guarantor.

B. By Borrower.

1. Authority.  Borrower represents and warrants that it has full authority to enter into this Agreement and to issue the Promissory Notes. Borrower further represents that is officers signing this Agreement and all Promissory Notes are authorized to act for the Borrower.

2. Use of Proceeds.  Borrower represents and warrants that the proceeds from the sale of the Promissory Notes shall be used only as follows:

   a.  To pay required fees to Guarantor.

   b.  To pay commissions to bona fide third party brokers for their services in connection with the marketing of the Promissory Notes.



7

# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration . Omine Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omners@hebei.net

    c.  Not less than Seventy-Five percent (75%) of the Promissory Note proceeds
shall be used by Borrower for business purposes as described in his business
plan at the outset.

3.  <u>Compliance with Law.</u>  Borrower represents and warrants to the best of his
knowledge and belief that the Promissory notes which are the subject of the Guarantee and the
methods by which Borrower will market and sell the Promissory Notes and all representations,
written or verbal, to be made by Borrower or its sales agents in connection with the marketing of
the Promissory Notes, fully comply with all applicable laws, rules and regulations, including but
not limited to all securities laws of the Untied States and or any jurisdiction in which the
Promissory Notes are marketed and sold.

4.  <u>Guarantee Unavailable from Other Sources.</u>  Borrower understands and
acknowledges that Guarantor is not licensed in the United States.  Borrower represents and
warrants that it has been unable to obtain this Guarantee from any other source.

VII.  MISCELLANEOUS

A.  <u>Choice of Law.</u>  This Agreement and all rights and obligations hereunder shall be
governed by and construed according to the internal laws of the State of New York.

C.  <u>Mandatory Arbitration of Disputes; Litigation Prohibited.</u>  All disputes arising under
or in connection with this Agreement, whether involving the claims or rights of Borrower,
Lenders and/or Guarantor, and whether arising under common law, statute or rule, and whether
sounding in contract or tort, shall be resolved through mandatory, binding, arbitration.  The place
of arbitration shall be New York, New York.  The arbitration shall be conducted under the rules
and auspices of the American Arbitration Association, or such other alternative dispute
resolution services provided as the parties to the dispute mutually shall agree.

All parties acknowledge and agree that arbitration of disputes is preferable to litigation.
Accordingly, if any party initiates litigation of any claim arising under or in connection with this
Agreement, such litigation shall be subject to immediate dismissal at the request of the other
parties to the dispute and the party initiating such litigation shall be liable for the other parties'
costs and reasonable attorneys fees incurred in connection with such litigation.

C.  <u>Integration.  No Modification Except in Writing.</u>  This Agreement contains the entire
agreement between and among the parties regarding Guarantor and/or the guarantee.  It



8

Sent By: Vista Consulting Corporation;   818 734 3074;   Dec-8-99  8.49AM;   Page 10/10



# NEW ENGLAND INTERNATIONAL SURETY INC.

European Administration: Omne Building, 11 avenue Lloyd George, 1000 Brussels-Belgium
Tel: 32-2-646 21 40 · Fax 32-2-646 32 86 · E-Mail: omnere@hebel.net

supersedes all prior oral or written agreements regarding its subject matter. There are no promises, representations or agreements involving Guarantor and/or the guarantee which are not expressly stated in this Agreement. This agreement may not be modified, except by a subsequent writing, signed by all parties.

D. Notices. All notices required under this Agreement and all demands for arbitration, shall be given by Certified mail, return receipt requested, to the following:

*TO BORROWER:*
DIGIZAP TECHNOLOGIES LLC
2311, Palm Avenue
Manhattan Beach
California 90266

*TO GUARANTOR·*
NEW ENGLAND INTERNATIONAL SURETY INC.
11 Avenue Lloyd George
Brussels, 1000, Belgium

*TO LENDER:*
The Address Contained in the Certificate.

*"BORROWER"*
DIGIZAP TECHNOLOGIES LLC

By _____
(Signature)
Printed Name WILLIAM A. VARELA
Title        Founder



"GUARANTOR"
NEW ENGLAND INTERNATIONAL SURETY, INC.

By _____
(Signature)
Printed Name HENDRIK RIENSTRA
Title VICE-PRESIDENT

9

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### (Orlando Division)

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | CASE NO. |
| ) | 99-1053-CIV-ORL-99A |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| SEBASTIAN INTERNATIONAL ENTERPRISES, ) | |
| et. al ) | |
| Defendants. ) | |
| ——————————————————— ) | |

### SEC's CONSOLIDATED OPPOSITION TO:

**(1)   DEFENDANTS' EMERGENCY MOTION TO REQUEST SECURED RELEASE OF EQUIPMENT SO THAT DEFENDANTS CAN CONTINUE PRODUCTION,**

**(2)   NEW ENGLAND INTERNATIONAL SURETY CO.'S MOTION TO INTERVENE, AND**

**(3)   NEW ENGLAND INTERNATIONAL SURETY CO.'S MOTION FOR RELINQUISHMENT OF ASSETS**

### THE FRUITS OF THE FRAUD SHOULD NOT BE RETURNED TO THE PERPETRATORS

This Court should not put the foxes in charge of the hen house. Movants ask this Court – which appointed a Receiver to marshal the remaining assets for the benefit of the defrauded investors – to reverse course and hand the fruits of the fraud right back to those who perpetrated a massive Ponzi scheme upon the public. The Securities and Exchange Commission ("SEC") opposes these motions because it is beyond peradventure that the Receiver – an independent agent of this Court – will best protect the interests of the defrauded investors. The Court should allow the Receiver to continue to attempt to make the defrauded investors as whole as possible.



EXHIBIT

## Defendants' Fraudulently Sold $17.7 Million Of Unregistered Notes

On August 19, 1999, the Court appointed a Receiver and entered a Temporary Restraining Order and other emergency relief on the SEC's showing that Defendants were defrauding the general public through a Ponzi scheme involving the offer and sale of $17.7 million of unregistered securities in the form of "high interest promissory notes." [See SEC's Memorandum of Law in Support of TRO] The SEC demonstrated that the Sebastians represented to unsuspecting investors that 100% of their funds would be used to create and produce a children's television program when, in reality, the Sebastians were using funds from new investors, including retirement funds, to pay interest to other investors, to finance their lavish lifestyle[1] and trade in stocks for their own benefit, and to pay undisclosed commission payments to their sales agents. The SEC demonstrated that the Sebastians already defrauded investors of at least $17.7 million. Not only have the Sebastians failed even to attempt to rebut the SEC's evidentiary showing, but the discovery taken to date amply confirms that the Sebastians were engaged in a massive fraud.

---

[1]    For example, between June 1, 1998 and July 31, 1999, the Sebastians spent almost $1 million of investor funds as follows:    $203,300 on private jet charters, $261,234 on luxury hotel accommodations in, among other places, Miami Beach, New York, London and Paris, $36,455 at jewelry stores, $26,374 on expenses relating to their boat, over $25,400 at gun and ammunition stores, $16,162 on a cruise, transferred $200,000 to their personal bank account, wrote checks totaling $21,500 to J. Sebastian, and wired another $150,000 to a charter jet company. Additionally, the Sebastians used other investor funds to pay for additional personal expenses, including approximately $148,000 on private jet charters. Finally, the Sebastians made substantial cash withdrawals of investor funds. Between just March 8, 1999 and June 21, 1999, the Sebastians cashed checks totaling $260,945, mostly in amounts between $9,500 and $9,999, thus circumventing federal banking regulations that require financial institutions to report cash withdrawals or checks that exceed $10,000. [SEC's Memorandum of Law in Support of TRO at 8-9]

2

   
Indeed, in his October 1999 deposition, Defendant Ferdinand Sebastian admitted that the

fraudulent sale of unregistered promissory notes operated in Ponzi fashion,[2] using money from later

investors to pay interest due to earlier investors:

Q:   Okay. But during the – from the time that the note program was completely run by SIE, the interest payments on the notes and any notes that may have been surrendered were from investor funds that were obtained from new investors, so that's where the money was coming from; is that correct?

A:   Not all of them, no. Not all of them. But definitely some of it. Most of it, because of our cash flow situation. **I mean, you've got the books. I'm not going to lie to you. It's – you know, it's coming from new investor money. \*\*\*** [Deposition of Ferdinand Sebastian, 10/21/99 at 174-175 (Exhibit A hereto) (emphasis added)]

In her deposition the next day, Defendant Jan Sebastian confirmed her husband's admission that they

were running a Ponzi scheme:

Q:   Okay. So in the period of time from, say, April '97 through at least September of 1998, are we agreed that the interest payments that would have to be made to existing investors came from money from additional investors who were putting in?

A:   That and in – well, **everything kind of went into one account.** If I did an outside job, a T.V. commercial, an infomercial, that money went in the bank.

Q:   Right.

A:   I'm pretty sure that the – any investor money went in the bank, and we just paid whatever bills out of that.

Q:   Right. Okay.

---

[2]   "A Ponzi scheme is an investment ruse whereby con men promise extraordinary returns on an investment, then fulfill their promise by acquiring additional investment capital from later investors and redirecting this new capital as the 'return' on the earlier investors' investments." Ballard v. Royal Trust Bank, No. 98-55592, United States Court Of Appeals For The Ninth Circuit, 1999 U.S. App. LEXIS 31595 at n. 3.

A:     And that would probably include – the interest probably came out of that, too.
       [Deposition of Jan Sebastian, 10/22/99 at 148-149 (Exhibit B hereto) (emphasis added)]

Jan Sebastian also admitted that she and her husband spent substantial amounts of investor money to

support their lavish lifestyle. For instance, in describing just one trip to Aspen, Colorado by private

chartered jet, Jan Sebastian admitted that she and another couple spent $2,700 for dinner one night at

Little Nell's, $4,500 for lodging, $3,200 for another dinner at Little Nell's, and $14,000 for furniture.

[Deposition of Jan Sebastian, 10/22/99 at 196-203 (Exhibit B hereto)]

## NEIS Is Surrounded By Numerous Badges Of Fraud

Proposed intervenor New England International Surety Co., Inc. ("NEIS") chose to do business

with the Sebastians, insuring approximately $8 million of the unregistered promissory notes. [NEIS'

Motion to Intervene at para. 5] Despite the fact that NEIS seeks to force the Receiver to relinquish a

substantial portion the defrauded investors' property, NEIS has provided virtually no information to this

Court that gives any comfort regarding its bona fides or its ability to honestly and competently

administer the defrauded investors' property for their benefit. To the contrary, the available evidence[3]

indicates that NEIS has a significant regulatory history, and lacks both the capacity and inclination to

serve the interest of investors. In fact, NEIS' history -- which is replete with numerous badges of fraud -

- indicates that NEIS' niche is providing illusory insurance for investment scams.

---

[3]      The SEC recognizes that some of the information set forth below would not satisfy
evidentiary requirements were the SEC asking the Court to make findings against NEIS. However,
since NEIS is asking the Court to invoke its equitable powers on its behalf, it is NEIS' burden to
answer the troubling questions that the available information raises about NEIS and its principal,
Hendrik Rienstra.

4

## 1.   1989 – NEIS Found Insolvent And Ordered To Cease and Desist in Louisiana

A May 1, 1989 article from "Business Insurance" reports that NEIS was ordered to cease and desist from doing insurance business in Louisiana after state examiners found NEIS to be insolvent. [Exhibit C hereto] The article reports that just prior to this finding of insolvency, NEIS reported assets totaling $301 million. Rather than attend a hearing before the Louisiana officials, NEIS and its president, Hendrik Rienstra,[4] simply turned the company's records over to the Louisiana regulators. The article further reports that NEIS was hit with Cease-and-Desist Orders and injunctions from several state insurance regulators due to its role as an insurer of Dyna Span Corp. of Boca Raton, Florida, which was itself the subject of numerous Cease-and-Desist Orders.

## 2.   1989 -- NEIS Ordered to Cease and Desist in Florida, an Order it Has Violated

Attached as Exhibit D is a February 15, 1989 Consent Order by the Department of Insurance of the State of Florida, with annexed Settlement Stipulation for Consent Order. Paragraph 3 of the Settlement Stipulation recites that the Department of Insurance alleged that NEIS engaged in the insurance business while unauthorized and not approved to transact insurance in the State of Florida. Paragraph 6 of the Consent Order required NEIS to Cease and Desist from issuing insurance on any risk in the State of Florida unless it fully met the requirements of the Florida Insurance Code and rules of the Department of Insurance. NEIS was ordered to disgorge $55,575.66 in unlawfully collected insurance

---

[4]    Mr. Rienstra is identified in NEIS' papers as Vice Chairman of NEIS' Board of Directors (NEIS' Motion to Intervene at 2) and it is he who provided the affidavit regarding NEIS' finances, claiming that it now has a net worth of $114 million. [Exhibit A to NEIS' Motion to Intervene]

Exhibit E reports that a Louisiana judge had issued an arrest warrant for Mr. Rienstra after finding him in contempt of court for failing to turn over the insurer's assets.

5

premiums (Consent Order, para. 4) and to pay an administrative penalty of $10,000 (Settlement
Stipulation, para 12).

It appears that NEIS violated this Consent Order. Although NEIS insured promissory notes sold
by the Sebastians in Florida, the Florida Department of Insurance has reported to the undersigned that it
has no record of NEIS being licensed to conduct insurance business in Florida.

### 3.    1998 – NEIS Insured Ponzi Scheme in Utah and Failed to Honor its Guarantees

A 1998 news article reports that NEIS insured promissory notes issued in a Ponzi scheme in
Utah. [Exhibit E hereto] The article reports that the SEC's complaint against the perpetrators alleged
that NEIS failed to honor its guarantees on the fraudulent promissory notes. [Exhibit E at page 4]

### 4.    1999 – NEIS Failed to Pay and Was Ordered to Cease and Desist in Kansas

On November 16, 1999, the Commissioner of Insurance of the State of Kansas entered an
Emergency Order regarding NEIS. [Exhibit F hereto] The Emergency Order found that NEIS had
falsely represented that it was admitted to do surety and insurance business in Kansas, and that NEIS
had guaranteed certain promissory notes, but failed to pay after the notes went into default (Emergency
Order, paras. 3, 6-8). NEIS was ordered to Cease and Desist from conducting insurance business in
Kansas (Emergency Order at page 10).

### 5.    1999 – NEIS Failed to Pay and Was Ordered to Cease and Desist in Connecticut

In 1999, NEIS was ordered by the Department of Banking of the State of Connecticut to Cease
and Desist from the unlawful sale of securities in the form of guarantees on promissory notes sold by the
Sebastians. The Connecticut Department of Banking alleged that although nine of the notes were in
default, NEIS failed to pay on those losses. [Exhibit G hereto at paras. 8-9]

6

## 6.    NEIS Is Using a Phony Agent in the United States

NEIS, which has no office in the United States, is fraudulently using a bogus agent for service. The second page of the "Master Guarantee" that NEIS has attached as Exhibit B to its Motion to Intervene purports to appoint "the Law Offices of M.Z. Hillyard and Associates, 14401 Sylvan Street, Suite 102 Van Nuys, CA 91401 USA to act as agents for the receipt of service of documents in the event of a claim." The undersigned has learned that Directory Assistance has no listing for an M.Z. Hillyard and Associates in Van Nuys, California. Moreover, the California Bar records available on-line on the Internet do not show an M.Z. Hillyard. Attached as Exhibit H hereto is a printout of the results of a search of these records for all California bar members with the last name "Hillyard." This search revealed no Hillyard in Van Nuys, and no Hillyard with the initials "M.Z."

## 7.    NEIS Gives Inconsistent Locations of Offices

NEIS claims to this Court to have offices in Brussels, Belgium; Bordeaux, France and Azerbaijan. [NEIS' Motion to Intervene at para. 4] However, this brief description is at odds with the insurance documents that NEIS has chosen to attach to its submission. NEIS' "Master Guarantee" and "Certificate" show NEIS' main office as being in Geneva, Switzerland, with subsidiary offices in Brussels, Bahrain, Riyadh, Paris and Athens. [Exhibit B to NEIS' Motion to Intervene]

## 8.    NEIS Has Failed to Make Rudimentary Financial Disclosures

NEIS, which asks this Court to entrust it with the defrauded investors' property, has failed to make even the rudimentary disclosure of providing an audited financial statement. NEIS has provided only an affidavit of Hendrik Rienstra [Exhibit A to NEIS' Motion to Intervene], who was discussed above in connection with NEIS' regulatory history. Mr. Rienstra is a foreign national who resides outside of the United States.

7

**9.   NEIS Has Failed to Make Any Meaningful Disclosure About its "Affiliate"**

Although NEIS proposes to transfer the defrauded investors' property to its purported United States' affiliate, OMNE S.R.L., Inc., NEIS has failed to make any meaningful disclosure about OMNE. NEIS states only that OMNE is its "affiliate" and is a New York corporation. [NEIS' Motion for Relinquishment of Assets at para. 9] NEIS has failed to explain anything about the nature of its relationship with OMNE, and also has failed to disclose anything whatsoever about OMNE's solvency.

**10.   As With Other Frauds With Which it Associated Itself, NEIS Has Failed to Pay**

Although NEIS has insured some $8 million worth of the fraudulently sold promissory notes [NEIS' Motion to Intervene at para. 5], which are now in default, to this date NEIS has not paid a cent under its insurance policies. Indeed, consistent with its history of failing to discharge its insurance obligations on the other investment scams it chose to insure, NEIS' promise here is illusory and unenforceable: NEIS states that if its gets all the relief it seeks it will "immediately begin payment of interest, and principal **where appropriate**, due under all the Notes which are the subject of the underlying action." [NEIS' Motion to Intervene at para. 10 (emphasis added)] This promise is illusory and unenforceable because NEIS retains the discretion to determine when any such payment would be "appropriate."

**11.   NEIS Will Allow The Sebastians to Manage The Defrauded Investors' Property**

The SEC understands that, if NEIS' motions are granted, NEIS would allow the Sebastians to manage any investor property that is turned over to NEIS. Additionally, the Sebastians are cooperating with NEIS' efforts to take over the investor property. Attached as Exhibit I is a Notice of Support for NEIS' Motion for Relinquishment signed by investor Byron Wenger. The undersigned was contacted by Mr. Wenger who related that the salesman who sold him the fraudulent, unregistered promissory

note (Ronald Wackler) contacted him and told him to support NEIS' motion because, unlike the
Receiver, NEIS would continue production of the television series. Thus, it appears that the Sebastians
have enlisted their sales force in support of NEIS' efforts to gain control of the defrauded investors'
property. In fact, the Sebastians have consented to NEIS' motions at the very time that they are seeking
control over the same investor property. Both the Sebastians' consent to NEIS' motions and the support
of their sales force for NEIS' motions is understandable: the end result of both the Sebastians' and
NEIS' motions would be the same – the Sebastians, the perpetrators of the fraud, would regain control
of the property that they stole from the defrauded investors.

* * *

In short, there is every reason to distrust NEIS' bona fides, including its ability to honestly and
competently manage the defrauded investors' property for their benefit.

## ARGUMENT

The motions should be denied because the Sebastians and NEIS have unclean hands, NEIS lacks
standing, the relief sought is contrary to the Receivership Order, and intervention would only cause
mischief and further dissipate investors' assets. There is no warrant in fact, equity or law for giving the
property of the defrauded investors back to the perpetrators and their cronies.

### A.   The Sebastians and NEIS Have Unclean Hands

The Sebastians and NEIS have unclean hands and should not be heard to invoke this Court's
equitable powers. The Court's appointment of the Receiver was a classic exercise of its considerable

9

equitable powers in SEC enforcement cases.[5]  Now, the Sebastians and NEIS ask this Court to reverse

course and to give the defrauded investors' property back to them, when they have unclean hands.  As

the perpetrators of this fraud who used investor funds for their personal benefit, the Sebastians have

unclean hands.  Similarly, NEIS, which despite its extensive regulatory history and in apparent violation

of a Florida Cease-and-Desist Order, chose to associate itself with the Sebastians' fraudulent,

unregistered note sales, and which to date has failed to honor its guarantees, has equally unclean hands.

Neither should be heard to invoke this Court's equity jurisdiction.

## B.    NEIS Lacks Standing to Claim an Interest in Receivership Property

NEIS seeks to intervene in order to move for an order requiring the Court-appointed Receiver to

turn the defrauded investors' property over to itself when NEIS lacks standing to claim an interest in

that property.  NEIS' convoluted attempt to show an interest in receivership property is a positively

Orwellian inversion of logic and commonsense:

> New England could become liable to the Note holders for as much as $8,000,000.00.
> If New England must make payments to the Note holders who are alleged to be victims of the
> inappropriate sale of securities by the Defendants, a circumstance which will occur if revenue
> is not generated by the assets held by the Receiver, **then, by virtue of subrogation, New
> England becomes the victim which the SEC is attempting to protect** through the
> underlying proceeding.  Accordingly, New England is a real party in interest in this matter.
> [NEIS' Motion to Intervene at para. 6 (emphasis added)]

---

[5]    The appointment of a Receiver is a well-established equitable remedy available to the SEC in
civil enforcement proceedings for injunctive relief.  See, e.g., SEC v. First Financial Group of Texas,
645 F.2d 429, 438 (5th Cir. 1981).  Here the Court used its equitable powers to give the Receiver "full
and exclusive power, duty and authority to administer and manage the business affairs of SIE, and
take whatever actions are necessary for the protection of the investors." [Order Appointing Receiver,
entered August 19, 1999, 1st Whereas clause; Agreed Order Appointing Receiver Over Additional
Entities, entered August 27, 1999, 1st Whereas clause]

By no stretch of the imagination can NEIS be viewed as "the victim which the SEC is attempting to protect." That NEIS, with its extensive regulatory history, chose to involve itself with the Sebastians' unregistered, fraudulent note sales cannot by any stretch make it a "victim."

NEIS' lack of standing to claim control of the defrauded investors' property is clearly revealed by considering what remedies it would have if the SEC had not filed this action and had the Court not appointed a Receiver. In that event, NEIS would be obligated to pay the claims of the defrauded investors (which it has not yet even started to do) and would be subrogated to their rights – i.e., it would have nothing more than a claim for monetary damages against the Sebastians and their businesses – it would not have the right to take possession of the defrauded investors' property. Moreover, under its "Master Guarantee" NEIS does not even have any such subrogation rights until after it makes payment for loss.[6] Having not paid a cent to date, NEIS has no subrogation rights. No greater rights can accrue to NEIS by virtue of the fact that the SEC has unmasked the Sebastians' fraud and caused this Court to appoint a Receiver.

## C.   The Relief Sought Contravenes the Receivership Order

This Court appointed a Receiver because it believed that she was best suited to marshal the assets for the benefit of the defrauded investors. The Court contemplated that persons might wish to interfere with the Receiver's administration of the estate and expressly ordered that:

> During the period of this receivership, all persons, including creditors, banks, investors, or others, with actual notice of this Order, are enjoined from *** in any way disturbing the assets or proceeds of the receivership or from prosecuting any actions or proceedings which

---

[6]     NEIS' "Master Guarantee" states: "Upon and to the extent the guarantor has made payment of loss under this guarantee, the guarantor shall be subrogated to all of the investors titles, rights and actions ***."

11

involve the Receiver or which affect the property of SIE. [Order Appointing Receiver at para. 15; Agreed Order Appointing Receiver Over Additional Entities at para. 15]

The Sebastians and NEIS are attempting to do precisely what the Court enjoined: disturb the assets or proceeds of the receivership.

## D.   Intervention Will Only Cause Mischief and Dissipate Investor Funds

It would be unthinkable for this Court to turn investor property back to the Sebastians, either directly or indirectly through NEIS. Since NEIS would not be entitled to the relief it ultimately seeks, this Court should not permit the mischief and further dissipation of investor funds that inevitably would result from NEIS' intervention. NEIS made clear that if intervention is granted it will attempt to conduct discovery "to determine the reasons giving rise to the Receiver's refusal to relinquish the assets of New England." [NEIS' Motion to Intervene at para. 9] The Receiver should not have to answer to NEIS, but should be permitted to discharge her duties to the defrauded investors without such interference. Were NEIS permitted to intervene and take discovery of the Receiver, investor funds would be dissipated for the entirely unproductive purpose of dealing with NEIS' discovery demands – a frolic that would not advance one jot the interests of defrauded investors in being made as whole as possible in the aftermath of the Sebastians' fraud.

## CONCLUSION

The SEC respectfully requests that the Court deny the motions by the Sebastians and NEIS.

This Court should not reverse course hand the defrauded investors' assets back to the Sebastians,

whether directly or indirectly through NEIS.

March 24, 2000                          Respectfully submitted,

Mitchell E. Herr
Regional Trial Counsel
District of Columbia Bar No. 395078
Direct Dial:  (305) 982-6336

Robbie Lake Mayer
Staff Attorney
Florida Bar No. 0771325

Attorneys for Plaintiff
THE UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
1401 Brickell Avenue, Suite 200
Miami, Florida 33131
Telephone: (305) 536-4700
Facsimile:  (305) 536-7465

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by FedEx

this 24th day of March, 2000 upon the following persons:

Mark F. Fisher, Esq.
Meininger, Fisher & Mangum, P.A.
Attorney for Lynn Cole, Receiver
111 North Orange Ave., Suite 1750
Orlando, FL 32802

Lynn Cole, Receiver
201 N. Franklin Street
Tampa, FL 33602

George Tragos, Esq.
The Law Office of George Tragos
Attorney for the Defendants
600 Cleveland Street, Suite 700
Clearwater, FL 34615

Lawrence C. Callaway, III, Esq.
Ayres, Cluster, Curry, McCall & Briggs, P.A.
Attorney for New England International Surety Co., Inc.
21 N.E. 1st Ave.
Ocala, FL 34470

Mitchell E. Herr